No. 01-884

IN THE SUPREME COURT OF THE STATE OF MONTANA

2003 MT 129

STATE OF MONTANA,

        Plaintiff and Appellant,

   v.

SAMUEL B. PALMER,

        Defendant and Respondent.

APPEAL FROM:    District Court of the Fourth Judicial District,
                      In and for the County of Missoula, Cause No. DC-01-236,
                      The Honorable John S. Henson, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

                Hon. Mike McGrath, Attorney General; Jim Wheelis,
                Assistant Attorney General, Helena, Montana

                Fred Van Valkenburg, Missoula County Attorney; Dale Mrkich, Deputy
                County Attorney, Missoula, Montana

        For Respondent:

                Craig Shannon, Attorney at Law, Missoula, Montana

                          Submitted on Briefs:  May 23, 2002

                                Decided:  April 29, 2003

Filed:

_____
                       Clerk

Justice Jim Regnier delivered the Opinion of the Court.

¶1 The State appeals an Order of the Fourth Judicial District Court, Missoula County, granting the motion to suppress filed by Defendant Samuel B. Palmer ("Palmer"). We reverse.

¶2 We address the following issue on appeal:

¶3 Did the District Court err in granting Palmer's motion to suppress?

BACKGROUND

¶4 On February 28, 2001, District Judge John W. Larson issued a search warrant for a Chevrolet school bus registered to Palmer. The search warrant application was based on a tip from an informant and video surveillance, among other information. Law enforcement executed the search warrant that same day. Based on the fruits of the search, the Missoula County Attorney filed an Information against Palmer charging him with two felonies and a misdemeanor: Count I: criminal possession of dangerous drugs with intent to distribute; Count II: possession of property subject to criminal forfeiture; and Count III: criminal possession of drug paraphernalia.

¶5 Palmer filed a motion to suppress, alleging the search warrant application ("Application") did not establish probable cause. District Judge John S. Henson granted the motion to suppress. The State appeals the suppression.

STANDARD OF REVIEW

¶6 We review a district court's grant of a motion to suppress "to determine whether the court's findings of fact are clearly erroneous and whether its interpretation and application

2

of the law are correct." *City of Cut Bank v. Bird*, 2001 MT 296, ¶ 18, 307 Mont. 460, ¶ 18, 38 P.3d 804, ¶ 18.

## DISCUSSION

¶7 Did the District Court err in granting Palmer's motion to suppress?

¶8 Detective Scott R. Brodie ("Brodie") of the Missoula Police Department applied for a search warrant for a 1975 Chevrolet school bus and a 1970 Suburban, both registered to Palmer. The Application states that the tip about Palmer first came from Joseph Vollstedt ("Vollstedt"). On December 20, 2000, Brodie had executed a search warrant in Vollstedt's home and found a large amount of marijuana and over $3700 in cash. Vollstedt was arrested and interviewed by the police. He admitted to the police that he sold marijuana in the Missoula area.

¶9 After spending a night in jail, Vollstedt agreed to cooperate with the police and act as a confidential informant, but would not allow them to record the information he gave them. Brodie later decided to name Vollstedt in the search warrant application because Vollstedt breached his agreement to cooperate with the police after his release from jail. Vollstedt told the police that "Sam" had sold marijuana to him. He did not know Sam's last name or his street address, but told the police that Sam had sold marijuana from a multi-colored school bus parked in an alley near the intersection of South 6th West and some railroad tracks and a foot trail. Vollstedt believed Sam lived in the school bus.

¶10 Vollstedt also told the police that he had known Sam for about one and a half years and that he purchased marijuana from Sam on at least eight occasions. Vollstedt provided

3

details about Sam's operation, such as how much Sam charged for the marijuana, a description of the scale Sam used to measure the marijuana, and how Sam sorted the bills and locked the money in a safe. Vollstedt described Sam as being in his early twenties, approximately 6-feet tall, and weighing approximately 175 pounds with short blond hair. Vollstedt further informed the police that Sam drove an older blue Chevrolet Suburban.

¶11 Brodie corroborated Vollstedt's tip by driving around the area described, looking for the bus. Brodie observed the bus as well as the Suburban, both of which were registered to Sam Palmer, in the area Vollstedt described. Brodie, along with Detective Dobie, attempted to further corroborate Vollstedt's tip by conducting periodic "drive-bys" of the bus and establishing video surveillance.

¶12 Further investigation revealed that Sam Palmer was not a registered tenant at the rental property behind which the bus was parked. Ernest Portis lived in the basement apartment and Timothy Foley and Javier Yocham lived upstairs. Brodie learned that Sam Palmer was a friend of Foley and Yocham, and they allowed Palmer to park his bus in their driveway. The detectives also obtained several loads of garbage that had been picked up from the residence.

¶13 The surveillance camera captured seven video tapes, each showing three days of activity at the rear door of the school bus. According to the search warrant application, the videos indicate that the bus is controlled by a subject who fits Palmer's description. The subject arrived at the bus between 9:00 a.m. and 1:00 p.m. and left and returned to the bus several times a day, often in a blue Chevrolet Suburban. Visitors arrived periodically,

4

knocked on the back door of the bus, and spent five to ten minutes inside the bus. The Application noted that no other houses in the neighborhood had as many vehicles visiting. One such vehicle the detectives observed in front of the house was registered to Teresa Franceschi, whose car was seen around the same time period parked in front of another house in which drugs were seized.

¶14    The Application also included a significant amount of information Brodie and Dobie obtained from the trash behind the house. The State concedes that some of the garbage evidence, namely the garbage with marijuana residue which was collected February 23, 2001, had no directly identifiable connection to Palmer and was not properly included in the search warrant application.

¶15    Judge Larson signed the Application on February 28, 2001, and it was executed the same day. Based upon the fruits of the search, Palmer was charged with two felonies and a misdemeanor: Count I: criminal possession of dangerous drugs with intent to distribute; Count II: possession of property subject to criminal forfeiture; and Count III: criminal possession of drug paraphernalia.

¶16    On October 24, 2001, Judge Henson granted Palmer's motion to suppress. Judge Henson concluded that the informant, Vollstedt, lacked reliability, that time frames as to Vollstedt's alleged purchases from Palmer were unclear, his information was not sufficiently corroborated, associations between Palmer and drug activity were tenuous, and evidence found in the trash could not be directly linked to Palmer. The State appeals the suppression of the evidence obtained during execution of the search warrant.

5

¶17     In *State v. Reesman*, 2000 MT 243, 301 Mont. 408, 10 P.3d 83, we set forth a step-by-step analysis for determining whether information given to the police by an informant is sufficient to establish probable cause.  First, if the informant is anonymous, corroboration of the informant's information through other sources is necessary.  If the informant is not anonymous, we then ask whether the informant's information is based on his or her personal observation of the described criminal activity.  If the information is not based on personal observation, again, independent corroboration is required.  *Reesman*, 2000 MT 243, ¶¶ 28-30, 301 Mont. 408, ¶¶ 28-30, 10 P.3d 83, ¶¶ 28-30.

¶18     Next, if the information is based on personal observations of a non-anonymous person, we must determine whether the informant is reliable.  Three categories of informants exist for purposes of determining reliability: (1) confidential informants; (2) informants who make an admission against interest; and (3) concerned citizens.  First, confidential informants are not deemed reliable unless the informant has given reliable and accurate information in the past.  Without a sworn statement by a law officer that an informant has been reliable and provided accurate information in the past, independent corroboration is required.  Second, if an informant makes an unequivocal admission against interest, further corroboration is not required.  "[A]dmissions of crime, like admissions against proprietary interests, carry their own indicia of credibility – sufficient at least to support a finding of probable cause to search."  *Reesman*, 2000 MT 243, ¶ 33, 301 Mont. 408, ¶ 33, 10 P.3d 83, ¶ 33.  Finally, informants motivated by "good citizenship" are deemed reliable if they provide information that demonstrates a sufficient degree of the nature of the circumstances under which the

6

incriminating information became known. *Reesman*, 2000 MT 243, ¶¶ 31-39, 301 Mont. 408, ¶¶ 31-39, 10 P.3d 83, ¶¶ 31-39.

¶19 Here, it is undisputed that Vollstedt was not a "concerned citizen." Palmer contends that Vollstedt was a confidential informant. Vollstedt provided the police with information about Palmer on the condition that he be treated as a confidential informant. Brodie used Vollstedt's name in the search warrant application only after he voided his agreement to cooperate. Therefore, Palmer would have us treat Vollstedt as a confidential informant, requiring corroboration, despite the fact that Vollstedt's identity was revealed in the search warrant application.

¶20 The State argues that Vollstedt provided the tip in the course of making an admission against interest, and thus no further corroboration is necessary. During Vollstedt's interview with Brodie, Vollstedt admitted to eight separate purchases of marijuana from Palmer over an eighteen-month period. Four of the purchases had been for a quarter-pound of marijuana and four had been for a half-pound. Palmer argues Vollstedt did not give the tip in the course of making an admission against interest because he had admitted to his involvement in the distribution of marijuana in Missoula prior to naming "Sam" as his supplier. Palmer further argues that the time frames as to Vollstedt's alleged purchases were unclear, and as such stale.

¶21 We need not decide whether Vollstedt should be treated as a confidential informant or as an informant who made an unequivocal admission against interest in the course of providing his tip. Regardless of how we assess Vollstedt's reliability, the search warrant

7

application demonstrated probable cause because it showed sufficient corroboration of Vollstedt's tip. The video surveillance of the back of the school bus indicated a high volume of frequent and short-term traffic to and from the bus, which Brodie, based upon his training and experience as a narcotics detective, determined to be consistent with the distribution of illegal drugs.

¶22 The District Court essentially determined that the video surveillance revealed no actual criminal activity. While this determination may be accurate, it does not necessarily lead to the conclusion that probable cause did not exist. Corroborative evidence need not show actual criminal activity. In *State v. Griggs*, 2001 MT 211, ¶ 50, 306 Mont. 366, ¶ 50, 34 P.3d 101, ¶ 50, we stated that the "[N]eed for 'adequate law enforcement investigation' . . . means that, when required, the subsequent corroboration of an informant's tip must reveal indicia of human conduct that becomes suspicious when viewed in conjunction with the incriminating information received from the informant concerning a suspect's particular criminal activity."

¶23 Accordingly, we conclude that the search warrant application did show probable cause, and the District Court erred in granting the motion to suppress evidence obtained during execution of the search warrant. Reversed.

/S/ JIM REGNIER

8

We Concur:

/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ PATRICIA COTTER
/S/ W. WILLIAM LEAPHART
/S/ JIM RICE

Justice Terry N. Trieweiler dissenting.

¶24 I dissent from the majority Opinion. I would affirm the order of the District Court which granted the Defendant's motion to suppress.

¶25 First, I conclude that Joseph Vollstedt was a confidential informant with no prior history of providing reliable and accurate information and that independent corroboration of his allegations was, therefore, required to establish probable cause for issuance of a search warrant. When Vollstedt disclosed information about Palmer's involvement and the possession and sale of illegal drugs, he did so with the understanding that his identity would not be disclosed. He went so far as to require that the recorder which had been previously recording his conversation with Detective Brodie be turned off. At no time did he subsequently agree that his identity could be included in the application for a search warrant. Brodie did so arbitrarily after he concluded that Vollstedt had breached his agreement with the police. In Brodie's words:

> On December 21, 2000, Detective Dobie interviewed Joseph VOLLSTEDT at the Missoula County Detention Center. Initially, VOLLSTEDT was cooperative and admitted his involvement in the distribution of marijuana in Missoula. At that time, VOLLSTEDT agreed to cooperate with the Missoula Police Department to further other investigations on condition that he be kept confidential to the greatest extent possible. On December 22, 2000, upon his release from jail, Joseph VOLLSTEDT voided this agreement by declining to provide any further information or cooperation. Therefore, Joseph VOLLSTEDT has been named as the source for much of the information contained within this application for search warrant.

¶26 It escapes me how, if Vollstedt's agreement with the police was "voided," the police could use the information gathered as a result of that agreement while dishonoring its

10

commitment to Vollstedt to keep his identity confidential. Brodie's arbitrary decision to selectively enforce the State's agreement with Vollstedt did not change the fact that when the information was provided, it came from a confidential informant.

¶27 Furthermore, the State concedes that Vollstedt was not a "concerned citizen" when he provided incriminating information about Palmer and I conclude that the information he provided was not against his penal interest and, therefore, he does not qualify for the only other category of informants discussed in *State v. Reesman*, 2000 MT 243, 301 Mont. 408, 10 P.3d 83. It is clear from Brodie's testimony at the suppression hearing that before Vollstedt incriminated Palmer, he had already admitted his involvement in illegal drug possession and distribution and his statements about Palmer did nothing to further incriminate him. The following Brodie testimony is an example.

> Q. You questioned him about the bulk of marijuana that was found at his house?
>
> A. Yes.
>
> Q. Which you suspected he was the main mover?
>
> A. Yes.
>
> Q. And he admitted it was his?
>
> A. Yes.
>
> Q. He admitted that he had sold it in Missoula?
>
> A. Yes.
>
> . . . .

11

Q. And he admitted to the felony possession of–or use of property subject to forfeiture?

A. Yes.

Q. And he admitted to misdemeanor paraphernalia?

A. Yes.

Q. And at that point in time, you said, okay. Now that you've given us your goods. You've told us about yourself and you've admitted to your wrongdoings–

A. Yes.

Q. Tell us where you're getting it from. And he said, turn off the tape?

A. I don't recall if he asked us to turn the tape off, or we had finished the interview with regard to his–the case at hand at that time. And the tape was turned off, and then we just asked him if he would be willing to cooperate, and he just started spouting off, but it was–it was one of those two.

¶28 Finally, I conclude that after excising that information in Brodie's application which was either inaccurate or unconnected to Palmer, the extent of the corroborating information for the confidential informant's allegation was Brodie's observation that during the twenty-one days of police surveillance of Palmer's bus, it was visited more frequently than other locations in the neighborhood and that the nature of those visits gave the appearance that business transactions were occurring. I would conclude that those facts were equally consistent with Brodie's discovery, that Palmer was an employee of a company which sold hammock style chairs and that he was in Missoula to sell those chairs. In fact, Brodie disclosed that while in Vollstedt's house, he observed that kind of chair hanging in the living room. While Brodie concluded that that observation corroborated Vollstedt's connection to

12

Palmer, it could just as well have suggested that Vollstedt gained his familiarity with the inside of Palmer's vehicle when he purchased his chair.

¶29 Our most recent and comprehensive decision which discusses the quality of corroboration necessary when corroboration of an informant's information is required is *State v. Griggs*, 2001 MT 211, 306 Mont. 366, 34 P.3d 101. We stated that:

> [U]pon closer review, not one case discussed in *Reesman* concerning the issue of independent police corroboration explicitly provides that the confirmation of unrelated non-criminal information alone would suffice to establish the substantial basis necessary for a reviewing magistrate's probable cause determination. *See, e.g., State v. Kaluza* (1995), 272 Mont. 404, 408, 901 P.2d 107, 109-10.

*Griggs*, ¶ 26.

¶30 We summarize the corroboration requirement as follows:

> We conclude, therefore, that this need for "adequate law enforcement investigation" as articulated in *Reesman* means that, when required, the subsequent corroboration of an informant's tip must reveal indicia of human conduct that becomes suspicious when viewed in conjunction with the incriminating information received from the informant concerning a suspect's particular criminal activity.

*Griggs*, ¶ 50.

¶31 Considered alone without other information regarding Palmer's lawful occupation as a salesman, the observations of frequent visits to Palmer's bus may have satisfied the test set forth in *Griggs* for otherwise lawful conduct which becomes suspicious when viewed in combination with an informant's incriminating information. However, I do not believe the activity can be viewed in a selective vacuum and when viewed in the context of Palmer's otherwise lawful occupation, the visits to his bus had a logical and lawful explanation.

13

Under these circumstances, I would conclude that the observations were not sufficient corroboration of unlawful activity to support the allegations of a confidential informant and provide probable cause for the issuance of a search warrant.

¶32     For these reasons, I dissent from the majority Opinion.  I would affirm the order of the District Court.

/S/ TERRY N. TRIEWEILER