No. 01-604

IN THE SUPREME COURT OF THE STATE OF MONTANA

2003 MT 243

STATE OF MONTANA,

        Plaintiff and Respondent,

    v.

FRANK FREDERICK REINER

        Defendant and Appellant.

APPEAL FROM:    District Court of the Twentieth Judicial District,
In and for the County of Lake, Cause No. DC 01-32
The Honorable C. B. McNeil, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

            Richard R. Buley, Tipp & Buley, Missoula, Montana

        For Respondent:

            Mike McGrath, Montana Attorney General, Tammy K. Plubell, Assistant
Montana Attorney General, Helena, Montana; Robert Long, Lake County
Attorney, Polson, Montana

Submitted on Briefs: November 7, 2002

Decided: September 11, 2003

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1 Frank Frederick Reiner (Reiner) was convicted of misdemeanor driving under the influence of alcohol or drugs. He was sentenced to six months in the Lake County Jail, with all but ten days suspended. He appeals. We reverse.

## ISSUE

¶2 Reiner presented several issues on appeal. The dispositive issue, as restated by this Court, and the only issue we will address is whether the District Court erred in concluding that the officers conducted a lawful community caretaking "welfare check" rather than an unlawful investigative stop.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 At approximately 5:08 a.m. on September 16, 2000, the Lake County Sheriff's Office dispatcher received a report of a possible intoxicated driver. The caller identified the vehicle as a green Ford pickup truck traveling southbound through Pablo, Montana. He indicated that the license plate was white with black lettering, began with the number "12," and appeared to be from another state. The caller did not provide any reasons for why he believed the driver was intoxicated.

¶4 This information was broadcast to local police officers and at 5:43 a.m., Ronan Police Officer Finkle (Finkle) observed a green Ford pickup bearing British Columbia license number 1238DN parked on the side of Highway 93 just outside the city limits of Ronan,

2

approximately ten miles south of Pablo.  The vehicle was parked in a location not normally used for parking.

¶5     Finkle parked behind the vehicle, activated his emergency lights and approached the car.  He found Reiner asleep or unconscious behind the wheel and knocked for two to three minutes before awakening Reiner.  Reiner rolled his window down and spoke to Finkle, who identified himself as a police officer and explained that he was trying to locate a vehicle that matched the description of Reiner's vehicle.  He requested Reiner's driver's license and registration, and noted that Reiner smelled of alcohol and that his eyes were "red and glassy." Finkle then returned to his patrol car to request a highway patrol officer because he was outside of his jurisdiction.

¶6     During this time, Tribal Officer Fiddler (Fiddler) arrived at the scene to offer backup to Finkle.  While Finkle contacted dispatch, Fiddler conversed with Reiner.  He also noticed the smell of alcohol and Reiner's bloodshot eyes.   Fiddler, who was outside of his jurisdiction as well, administered the horizontal gaze nystagmus (HGN) test on Reiner.  Reiner scored a six of a possible eight on the HGN, indicating intoxication.  Fiddler reported the test results to Finkle.

¶7     At approximately 6:00 a.m., Montana Highway Patrol Officer Wycoff (Wycoff) arrived on the scene.  After also noticing Reiner smelled of alcoholic and was slurring his speech, he administered a field sobriety test which indicated that Reiner was impaired.  Reiner agreed to take a PBT, the result of which was .172.  Wycoff arrested and transported

3

Reiner to the Lake County Sheriff's Office. During processing, Reiner took an Intoxilyzer breath test and scored a .174.

¶8     A bench trial was held in Justice Court, Lake County, Polson, Montana, on March 22, 2000, and Reiner was found guilty of misdemeanor driving under the influence of alcohol in violation of § 61-08-401, MCA. Reiner was ordered to serve six months in the Lake County detention center, with all except ten days suspended. Reiner appealed his judgment and sentence to the Twentieth Judicial District Court. Once in District Court, Reiner filed a motion to suppress all evidence against him, arguing that there was no particularized suspicion justifying the initial stop and investigation. Without such suspicion, he maintained, the officers had no legal justification for the stop and any evidence obtained during it must be suppressed. After accepting briefs from both parties but without holding a hearing, the District Court summarily dismissed Reiner's motion to suppress, and on June 13, 2001, Reiner entered a nolo contendere plea. The District Court then found Reiner guilty of the charged offense and imposed the same judgment as had Justice Court.

¶9     Reiner subsequently appealed the District Court's judgment. While the appeal was pending, the State filed a motion in this Court to remand the case to District Court for an evidentiary hearing on Reiner's motion to suppress--specifically for a determination of whether there was an investigative stop and whether there was particularized suspicion to support such a stop. We granted the State's request and, by Order of the Court, the District Court held an evidentiary hearing on January 28, 2002.

¶10    On February 13, 2002, the District Court issued its Findings of Fact, Conclusions of Law and Order Denying Motion to Suppress.  In its Order, the court concluded that: 1) the initial citizen report was insufficient to justify an "investigative stop"; 2) Reiner's vehicle was already stopped, and therefore Finkle did not perform an "investigative stop;" and 3) no particularized suspicion was required for Finkle to approach and engage Reiner in conversation under Finkle's "community caretaking" responsibilities.

¶11    Reiner appeals, arguing once again that the officers did not have particularized suspicion to justify the stop and that therefore, all evidence obtained during the stop should have been suppressed.

### STANDARD OF REVIEW

¶12    When we review a district court's conclusions of law, the standard of review is plenary and we determine whether the district court's conclusions of law are correct as a matter of law.  *State v. Keenan*, 2003 MT 190, ¶ 7, 316 Mont. 493, ¶ 7, ___ P.3d ___, ¶ 7 (citation omitted).

### DISCUSSION

¶13    The District Court concluded in its Order that the initial citizen report was insufficient to justify an investigative stop because the citizen merely stated that a driver may be drunk but did not describe any objective data sufficient to create particularized suspicion.  The court, however, then concluded that because the officers did not actually "stop" Reiner, as his car was already parked, they did not conduct an "investigative stop." The court continued

5

that, regardless of the citizen report, Finkle had a responsibility to conduct a "welfare check" of Reiner and that such a check does not require particularized suspicion.

¶14     Analyzing the first conclusion of the District Court's Order, we agree that the initial citizen report was insufficient to justify an investigative stop. Section 46-5-401, MCA, provides:

> Investigative stop. In order to obtain or verify an account of the person's presence or conduct or to determine whether to arrest the person, a peace officer may stop any person or vehicle that is observed in circumstances that create a particularized suspicion that the person or occupant of the vehicle has committed, is committing, or is about to commit an offense.

¶15     Moreover, "To justify an investigative stop, an officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *State v. Martinez*, 2003 MT 65, ¶ 21, 314 Mont. 434, ¶ 21, 67 P.3d 207, ¶ 21 (citations omitted).

¶16     For an officer to effect an investigative stop based on a citizen informant's report: (1) the citizen informant must identify himself or herself to law enforcement, (2) the report must be based upon the informant's personal observations, and (3) the officer must corroborate the informant's information by observing illegal activity or finding the person, the vehicle, and the vehicle's location substantially as described by the informant. *State v. Wagner*, 2003 MT 120, ¶ 13, 315 Mont. 498, ¶ 13, 68 P.3d 840, ¶ 13 (citation omitted).

¶17     Our case law establishes that for a citizen's report of criminal wrongdoing to be considered reliable by police officers, it must contain sufficient detail to provide a basis for the citizen's conclusion that a criminal act was taking place. In *State v. Lee* (1997), 282

6

Mont. 391, 938 P.2d 637, an anonymous citizen informant provided the dispatcher with a description of a vehicle, the vehicle's general direction of travel and the informant's opinion that the driver was drunk and speeding. When the officer encountered Lee's vehicle, he initiated an investigatory stop without first assessing whether the information was reliable or had any basis in fact and, without corroborating the information by personally observing any illegal activity or indication of impaired or erratic driving. We concluded that a citizen informant's opinion which is not supported by either the basis for such belief or by the officer's personal observations cannot be sufficient to form a particularized suspicion. *Lee*, 282 Mont. at 396, 938 P.2d at 640; *see also State v. Williamson*, 1998 MT 199, 290 Mont. 321, 965 P.2d 231.

¶18     In addition, we note that Finkle was outside his jurisdiction when he encountered and detained Reiner. In *Williamson*, we explained that § 46-5-401, MCA, authorizes a "peace officer" to stop a person or vehicle under statutorily-described circumstances. *Williamson*, ¶ 11. We then noted that the definition of "peace officer" is "any person who by virtue of the person's office or public employment is vested by law with a duty to maintain public order and makes arrests for offenses while acting within the scope of the person's authority." Section 46-1-202(16), MCA (1999). We stated that an out-of-jurisdiction peace officer has the same authority as a private citizen to make a citizen's arrest and that such an arrest must be based on probable cause, rather than the particularized suspicion standard reserved for peace officers within their jurisdiction. *Williamson*, ¶¶ 16, 20. The rule stated in *Williamson* applies to the case before us. Not only did Finkle not have particularized suspicion; he did

7

not have probable cause, which as an out-of-jurisdiction peace officer, he was required to have to institute an investigative stop.

¶19 Moving to the District Court's second conclusion, we disagree that Finkle's contact with Reiner was not a "stop" because the vehicle was already at a standstill. A "stop" is defined by statute as "the temporary detention of a person that results when a peace officer orders the person to remain in the peace officer's presence." Section 45-2-101(71), MCA. Thus, it is the detention of the person, as opposed to the physical act of pulling a vehicle over to the side of the roadway, which is determinative of whether a "stop" has occurred. We have not previously required that an officer demand that a moving vehicle come to halt before a "stop" can be effected. *See, for example, Kleinsasser v. State*, 2002 MT 36, 308 Mont. 325, 42 P.3d 801.

¶20 Finally, we reject the District Court's conclusion that Finkle did not make an investigative stop but rather fulfilled his community caretaking duty to check on the welfare of the driver. This Court meticulously analyzed the "community caretaker" doctrine in *State v. Lovegren*, 2002 MT 153, 310 Mont. 358, 51 P.3d 471, and adopted the following test:

> First, as long as there are objective, specific and articulable facts from which an experienced officer would suspect that a citizen is in need of help or is in peril, then that officer has the right to stop and investigate. Second, if the citizen is in need of aid, then the officer may take appropriate action to render assistance or mitigate the peril. Third, once, however, the officer is assured that the citizen is not in peril or is no longer in need of assistance or that the peril has been mitigated, then any actions beyond that constitute a seizure implicating not only the protections provided by the Fourth Amendment, but more importantly, those greater guarantees afforded under Article II, Sections 10 and 11 of the Montana Constitution as interpreted in this Court's decisions.

*Lovegren*, ¶ 25.

¶21 The District Court concluded that, under the community caretaking doctrine, Finkle had a responsibility to check on the welfare of Reiner upon seeing his car parked on the side of the road, and that Finkle's approach to Reiner was a lawful "welfare check." Finkle, however, testified that he approached Reiner, not out of concern for his well-being or to determine if Reiner needed aid, but because he thought Reiner was the DUI that had been called into dispatch. The relevant portion of the transcript provides:

*Question*: And what did you tell him about why you stopped him?

*Finkle*: This was an attempt to locate a vehicle matching the description of his vehicle.
. . .
*Question*: And actually, from your previous testimony, as I understood it, after awakening Mr. Reiner he rolled down his window, you advised him that you are a police officer and that his vehicle matched the description of the car you were looking for; right?

*Finkle*: Correct.

*Question*: So the reason that you came up to the window and banged on the window and were talking to Mr. Reiner wasn't to see if he was all right. It was to check out this call from dispatch; right?

*Finkle*: I believe I've already stated that, sir.

*Question*: Okay. In fact, you never even did ask Mr. Reiner if he was all right or he had any problems, did you?

*Finkle*: No, sir, I did not.
. . .
*Cross-examination Question*: Would you have gone back to the vehicle even if you didn't have the report from dispatch about the possible drunk driving?

*Finkle*: Yes, I would have.

9

¶22 Despite the State's attempt on cross-examination to turn an investigative stop into a welfare check, we conclude that the first prong of the community caretaking rule as announced in *Lovegren* was not fulfilled. Finkle did not stop out of concern for Reiner being in peril or in need of assistance. He stopped and commenced the investigation because of the DUI report. Therefore, we conclude that this stop was not undertaken as a lawful community caretaking "welfare check." This being so, and because there was not probable cause, much less particularized suspicion sufficient to justify the stop, Finkle's conviction cannot stand.

## CONCLUSION

¶23 For the foregoing reasons, we reverse Reiner's conviction and judgment.

/S/ PATRICIA COTTER

We Concur:
/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ JIM REGNIER

Justice Jim Rice, dissenting.

¶24 I respectfully dissent.

¶25 "If events are capable of different interpretations, the trier of fact determines which is most reasonable." *State v. Brogan* (1993), 261 Mont. 79, 87, 862 P.2d 19, 24. Our duty is not to ascertain whether the evidence would support a different factual finding, but to assure that the findings adopted by the trial court are not clearly erroneous and supported by substantial evidence, including those factual findings made by the trial court in ruling on a

12

motion to suppress evidence. *See State v. Weaselboy*, 1999 MT 274, ¶¶ 6, 24, 296 Mont. 503, ¶¶ 6, 24, 989 P.2d 836, ¶¶ 6, 24. The weight of the evidence is to be left to the district court as the trier of fact. Concluding that there is sufficient evidence to support the District Court's findings and its interpretation of the events at issue, I would affirm.

¶26 It should be noted that the usual order of presentation–the State proceeding first–was reversed in this matter. Defense counsel called witnesses first, and called Officer Finkle to the stand as his first witness. It should come as no surprise that defense counsel made no effort to develop testimony in support of a "community caretaker" theory of the case during his direct examination of Officer Finkle. That burden fell to the State to be developed on cross-examination.

¶27 Officer Finkle testified during the prosecutor's cross-examination:

Q. Okay. Is it part of your normal patrol procedure to stop and check vehicles that are parked on the side of the highway?

A. Yes, it is.

Q. Let me ask you this. Is that a normal parking area?

A. No, this was not.

Q. Okay. And what's the purpose of stopping to check on a vehicle that's pulled off the road in an area like that?

A. To see if the vehicle is disabled; to see if possibly there is someone in the vehicle who had been drinking and passed out; if the vehicle is creating a hazard on the roadside; if they have mechanical problems. There's a myriad of reasons.

. . . .

13

Q. Okay. And how long did you tap on the window before you got a response from the driver?

A. Two to three minutes.

Q. Okay. In your experience is that–when you testified on direct you referred to him as being passed out. In your experience is that length of time to arouse somebody consistent with somebody who has been drinking?

A. Correct.

Q. Now you were parked behind the vehicle with your lights on.

A. Correct.

Q. What's the purpose of turning your lights on?

A. That's for my safety, the vehicles on the highway, the safety of the individual in the vehicle, if there is someone in the vehicle . . . .

Q. Obviously you didn't turn your lights on to make the vehicle come to a stop; correct?

A. No.

. . . .

Q. Would you have gone back to the vehicle even if you didn't have the report from dispatch about the possible drunk driving?

A. Yes, I would have.

¶28    After hearing the witnesses, the District Court assessed their credibility, weighed the evidence, and entered findings of fact. It found that at 5:43 a.m., on September 16, 2000, Officer Finkle observed a green Ford pickup parked on the side of Highway 93, just outside of the Ronan city limits, in an area which was not a normal parking area, and further, that it was a normal part of Finkle's duty to stop and check vehicles stopped in this area, even

14

without receiving a call about a possible drunk driver (Finding #2). The District Court also found that the officer activated his lights to warn passing motorists of the hazard by the road and that the defendant was passed out behind the wheel, and not just sleeping (Finding #3). The District Court concluded that "independent of the earlier citizen report, Officer Finkle had a responsibility and a community caretaking duty to check on the welfare of the driver when the officer came upon the vehicle parked on the shoulder of Highway 93 with the driver asleep or passed out at the wheel." (Conclusion #4.)

¶29    Given the testimony, there was substantial evidence to support the interpretation of these events which  the trier of fact determined was "the most reasonable." *Brogan*, 261 Mont. at 87, 862 P.2d at 24. The record reveals "objective, specific and articulable facts from which an experienced officer would suspect that a citizen is in need of help or is in peril . . . ." *State v. Lovegren*, 2002 MT 153, ¶ 25, 310 Mont. 358, ¶ 25, 51 P.3d 471, ¶ 25. It was indeed Officer Finkle's duty, which he properly executed, and the duty of all police officers in like situations, to check a vehicle parked along a busy highway at 5:43 in the morning, in a place where vehicles do not normally park and which could present a hazard to traffic, to see if someone needed help or was in peril. That check properly led to the discovery of evidence that the defendant was driving while under the influence.

¶30    I would affirm.

/S/ JIM RICE

15