No. 04-787

IN THE SUPREME COURT OF THE STATE OF MONTANA

2005 MT 307

STATE OF MONTANA,

        Plaintiff and Appellant,

    v.

TAMMIE SEAMAN,

        Defendant and Respondent.

APPEAL FROM:    The District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause No. DDC 2004-130,
Honorable Dirk M. Sandefur, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

            Hon. Mike McGrath, Montana Attorney General, John Paulson,
Assistant Attorney General, Helena, Montana

            Brant S. Light, Cascade County Attorney, Marty Judnich, Deputy
County Attorney, Great Falls, Montana

        For Respondent:

            Steven M. Hudspeth, Attorney at Law, Great Falls, Montana

Submitted on Briefs:  September 7, 2005

Decided:  December 6, 2005

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1    Tammie Seaman was convicted of driving under the influence (DUI) following the Justice Court's denial of her motion to suppress. She appealed to the District Court for the Eighth Judicial District, Cascade County. The District Court determined that the officer involved had no lawful basis to stop and detain Seaman for a welfare check under the Community Caretaker Doctrine. Hence, the District Court reversed the Justice Court's Order denying Seaman's motion to suppress and further reversed the resulting Justice Court judgment of conviction. The State now appeals asking that we reverse the District Court and order that Seaman's DUI conviction be reinstated. We reverse and remand.

¶2    We address the following issue on appeal: Whether the District Court misinterpreted or misapplied the Community Caretaker Doctrine and thereby erroneously reversed the Justice Court's Order denying Seaman's motion to suppress.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3    On January 6, 2004, at about 3:15 p.m., Officer Robert Armstrong of the Montana Highway Patrol was driving northbound on Interstate 15 about four miles northwest of Great Falls. As he drove by the Manchester Interchange, Officer Armstrong looked to his left across the median to the southbound lane and saw a red passenger car parked on the shoulder of the off-ramp of the interchange. He noticed that there was someone sitting in the driver's seat of the vehicle. The temperature at the time was near zero, with a substantial sub-zero wind chill factor.

2

¶4    Officer Armstrong, who has over eight years of experience with the Montana Highway Patrol, became concerned that someone in the parked car might need assistance, hence he decided to check out the situation. He drove up the interstate for about half a mile, turned onto the southbound lane at a crossover, and drove back to the parked car. When Officer Armstrong pulled up behind the parked car and turned on his overhead emergency lights, his dash-mounted video camera was automatically activated, and the events that followed were recorded.

¶5    As Officer Armstrong drove up behind the parked car, he observed that the person who had been in the car and who was later identified as Seaman, was now standing outside the car on the passenger side and that both passenger side doors were open. Officer Armstrong did not see anyone else in the car. As Officer Armstrong pulled up to a stop behind the car, Seaman closed the car doors and walked slowly around the back of the car, holding onto the rear and side of the car and glancing toward the patrol car. Seaman continued to the front of her car, opened the driver's door, and got into the car. Officer Armstrong got out of his patrol car, activated the external microphone on his uniform, and walked up to the driver's window.

¶6    Officer Armstrong later testified that because he was still unsure that everything was okay, he went up to the driver's window and asked Seaman some questions. As he did so, he noticed that Seaman's eyes were bloodshot and glassy, her speech was slurred, and he smelled the odor of alcohol. Seaman told Officer Armstrong that she and her car were okay and that she had stopped her car because she had asthma. When Officer Armstrong asked if

3

she had a medical problem and if she needed an ambulance, she responded that she did not. When Officer Armstrong asked her if she had been drinking, Seaman initially said she had not, but she later admitted that she had had several beers.

¶7 Based on his observations, Officer Armstrong decided to commence a DUI investigation. After further questioning and the administration of the horizontal gaze nystagmus test, Officer Armstrong arrested Seaman for DUI. Seaman's preliminary breath test at the scene indicated a blood alcohol concentration (BAC) of .209 and a subsequent test showed a BAC of .219.

¶8 Seaman was charged with second-offense DUI, a misdemeanor in violation of § 61-8-401, MCA. She filed a motion to suppress all evidence acquired during her encounter with Officer Armstrong. On March 24, 2004, the Justice Court, which has been established as a court of record pursuant to § 3-10-101(5), MCA, conducted an evidentiary hearing on the motion. The videotape of Officer Armstrong's encounter with Seaman was admitted as an exhibit and played at the hearing. At the conclusion of the hearing, the Justice Court determined that Officer Armstrong contacted Seaman under the Community Caretaker Doctrine and that his actions and questions did not exceed the scope of his reason for contact--i.e., to determine whether Seaman was in need of aid. Hence, the Justice Court denied the motion to suppress. Following a bench trial, Seaman was convicted of the charge and she appealed to the District Court.

¶9 On October 12, 2004, following briefing by both sides, the District Court issued an Order reversing the Justice Court's Order denying the motion to suppress and reversing the

4

judgment of conviction. The State appeals the District Court's Order to this Court. Seaman failed to file a brief on appeal before this Court.

**STANDARD OF REVIEW**

¶10     We review a district court's grant of a motion to suppress to determine whether the court's findings of fact are clearly erroneous and whether the court's interpretation and application of the law are correct. *State v. Palmer,* 2003 MT 129, ¶ 6, 316 Mont. 46, ¶ 6, 68 P.3d 809, ¶ 6 (citing *City of Cut Bank v. Bird*, 2001 MT 296, ¶ 9, 307 Mont. 460, ¶ 9, 38 P.3d 804, ¶ 9). In an appeal from a justice court established as a court of record, the district court functions as an appellate court and the appeal is confined to a review of the record and questions of law. Section 3-10-115(1), MCA. This Court's constitutional power and obligation of final appellate review confer jurisdiction to hear an appeal from a district court's ruling. *State v. Caldwell*, 1998 MT 261, ¶ 13, 291 Mont. 272, ¶ 13, 968 P.2d 711, ¶ 13 (citing Art. VII, § 2(1), Mont. Const.; *State v. Finley* (1996), 276 Mont. 126, 135, 915 P.2d 208, 214, *overruled in part by State v. Gallagher*, 2001 MT 39, 304 Mont. 215, 19 P.3d 817). Thus, both the District Court and this Court review the Justice Court's factual findings for clear error and its legal conclusions for correctness.

**DISCUSSION**

¶11 *Whether the District Court misinterpreted or misapplied the Community Caretaker Doctrine and thereby erroneously reversed the Justice Court's Order denying Seaman's motion to suppress.*

¶12 The State argues on appeal that viewing the encounter between Seaman and Officer Armstrong in light of the analysis of the Community Caretaker Doctrine first set forth in *State v. Lovegren*, 2002 MT 153, 310 Mont. 358, 51 P.3d 471, this Court should conclude that the Justice Court correctly applied the Community Caretaker Doctrine to the facts of this case, that the District Court misapplied *Lovegren* by according insufficient investigative latitude to Officer Armstrong as he was lawfully acting under the Community Caretaker Doctrine, and that the District Court's Order should be reversed.

¶13 As we stated in *Lovegren*, not all contact between law enforcement officers and citizens involves the "seizure" of a person under the Fourth Amendment. *Lovegren*, ¶ 13. The officer in *Lovegren* was on routine patrol when he came upon a vehicle parked on the side of the highway with its motor running and its headlights off. Concerned for the welfare of the vehicle's occupant, the officer stopped, approached the vehicle on foot and saw the defendant sitting in the driver's seat, apparently asleep. The officer knocked on the window and when the defendant did not respond, the officer opened the door. The defendant woke up and the officer immediately observed indications of possible intoxication. The defendant was subsequently charged with driving under the influence of alcohol in violation of § 61-8-401, MCA. *Lovegren*, ¶¶ 3-4.

6

¶14 The defendant in *Lovegren* moved to suppress all of the evidence obtained by the officer claiming that it was an illegal search and seizure. The Justice Court denied the motion and convicted the defendant of the DUI charge. The defendant appealed to the District Court contending that the officer lacked a particularized suspicion of any wrongdoing on defendant's part, thus the stop was not justified. The District Court denied defendant's motion to suppress stating that a particularized suspicion was not required in this situation as the officer had a duty to investigate for the defendant's own safety. Thereafter, the defendant agreed to plead guilty, but he reserved his right to appeal the denial of his motion to suppress. *Lovegren*, ¶¶ 5-7.

¶15 This Court discussed the Community Caretaker Doctrine at length in *Lovegren*. We stated therein that the doctrine serves to justify certain police-citizen encounters that, at their inception, are unrelated to the detection and investigation of crime. *Lovegren*, ¶ 16. We noted in *Lovegren* that the police must frequently engage in certain community caretaking functions totally divorced from the enforcement of criminal laws, particularly with respect to automobiles on public highways. Such functions may include assisting motorists who are stranded, involved in accidents, or otherwise in need of assistance. *Lovegren*, ¶ 17. Assisting a motorist in peril or in apparent need of aid is often viewed as an affirmative duty of the police and we indicated in *Lovegren* that it would be a dereliction of an officer's duty to walk away from an uncertain situation in which a motorist may be in need of help. *Lovegren*, ¶ 26.

¶16     While this Court did not attempt to define the scope and parameters of the Community Caretaker Doctrine in *Lovegren*, we did establish the following test to be applied to community caretaking encounters between the police and citizens:

> First, as long as there are objective, specific and articulable facts from which an experienced officer would suspect that a citizen is in need of help or is in peril, then that officer has the right to stop and investigate. Second, if the citizen is in need of aid, then the officer may take appropriate action to render assistance or mitigate the peril. Third, once, however, the officer is assured that the citizen is not in peril or is no longer in need of assistance or that the peril has been mitigated, then any actions beyond that constitute a seizure implicating not only the protections provided by the Fourth Amendment, but more importantly, those greater guarantees afforded under Article II, Sections 10 and 11 of the Montana Constitution as interpreted in this Court's decisions.

*Lovegren*, ¶ 25.

¶17     Based on this test, we held in *Lovegren* that the officer in that case had objective facts to support his concern that the defendant might be in need of assistance, since the defendant could have been ill rather than simply asleep and the officer had a duty to check on the defendant's welfare and to open the door when the defendant did not respond to a knock on the window. We also held that opening the door to check on the defendant's welfare did not constitute a "seizure" implicating defendant's constitutional protections against unreasonable searches and seizures. *Lovegren*, ¶ 26.

¶18     We have applied the test set forth in *Lovegren* in three subsequent cases: *State v. Reiner*, 2003 MT 243, 317 Mont. 304, 77 P.3d 210; *State v. Nelson*, 2004 MT 13, 319 Mont 250, 84 P.3d 25; and *State v. Smith*, 2004 MT 234, 322 Mont. 466, 97 P.3d 567.

¶19    In *Reiner*, we distinguished *Lovegren* and held that the officer in *Reiner* approached the defendant's parked vehicle not to check on the defendant's welfare, but because the officer thought that the defendant was the subject of a DUI report that had been called into the sheriff's office. Since the officer was outside his jurisdiction and the DUI report was insufficient to establish particularized suspicion or probable cause for an investigative stop, we concluded that the first prong of *Lovegren's* community caretaking test was not satisfied and that the stop could not be justified as a welfare check. *Reiner*, ¶¶ 21-22.

¶20    *Nelson*, on the other hand, is factually similar to the instant case. The highway patrol officer in *Nelson* observed the defendant's truck pulled off of the highway with its engine running on New Year's Day. The temperature at the time was near zero. The officer drove by the truck, obtained the license number, and ran the plate through her dispatcher. As the officer turned around to return to the truck, she was informed by the dispatcher that the truck belonged to the defendant, whose license she believed had been suspended. The officer found the defendant in the driver's seat, apparently passed out. As the officer approached the truck on foot, the defendant woke up and stared straight ahead. The officer opened the door, engaged the defendant in conversation, and observed signs of intoxication. *Nelson*, ¶ 4.

¶21    Relying on our decision in *Lovegren*, we noted in *Nelson* that police officers have a duty not only to fight crime, but also to investigate uncertain situations in order to ensure public safety. *Nelson*, ¶ 6. Hence, we concluded that, under the circumstances, the officer in *Nelson* was correct to approach the defendant's vehicle to check on his welfare. We also concluded that even if the officer suspected that the defendant's license was suspended, the

9

primary purpose of the investigation was to determine whether any possible occupants of the vehicle needed assistance. And, we noted that, as in *Lovegren*, the officer in *Nelson* could have been remiss in her duty had she stopped her inquiry before she determined whether the defendant needed assistance. *Nelson*, ¶ 9.

¶22 While *Lovegren*, *Reiner* and *Nelson* all involved an officer stopping to investigate vehicles parked on the side of a highway, *Smith*, the fourth Montana case involving the Community Caretaker Doctrine, involved an officer's warrantless entry into the bathroom of an apartment. *Smith*, ¶¶ 3-4. Hence, *Smith* is distinguishable from the instant case on its facts. Nevertheless, we did analyze the officer's investigation in *Smith* under the test set forth in *Lovegren* and we determined that the officer's entry into the bathroom was not justified by the Community Caretaker Doctrine. *Smith*, ¶ 15.

¶23 Applying the *Lovegren* test to the case *sub judice*, the facts support the conclusion that Officer Armstrong had objective, specific and articulable facts suggesting that Seaman might be in need of assistance, thereby satisfying the first prong of the test. The weather conditions, the relatively remote location, and the fact that the vehicle was parked on the side of the highway for no readily apparent reason provided an experienced officer such as Officer Armstrong with a valid reason for stopping and investigating the possibility that Seaman's car was disabled or that Seaman was experiencing medical or physical problems.

¶24 The District Court determined that Officer Armstrong had an objectively reasonable concern that Seaman might be stranded or otherwise in need of assistance when he first saw Seaman's parked car. However, the court also determined that when Officer Armstrong

10

pulled up behind Seaman's car, he did not observe anything that created an objectively reasonable suspicion that Seaman was then in need of assistance. Hence, the court concluded that all observations and evidence obtained after Officer Armstrong actually made contact with Seaman at her car door were the fruit of an illegal seizure of her person. The court based its decision primarily upon its interpretation of the videotape, focusing on the 45-second interval between the time the video camera was activated by Officer Armstrong and the time he started asking Seaman if she was okay.

¶25 The District Court further noted that Officer Armstrong saw that Seaman's car was running and that he did not see any sign of distress or anything unusual or wrong with Seaman or the car. The court made much of the fact that Seaman walked around her car, looked at Officer Armstrong, but did not gesture to him that she needed or desired assistance. However, neither did Seaman gesture to Officer Armstrong that she did *not* need or desire assistance. Seaman could very well have gotten back into her car out of the cold and the wind intending to wait for Officer Armstrong to approach her.

¶26 The District Court also hinged its decision on the fact that the videotape showed that Seaman got back into her car, put on her seat belt and activated her left turn signal. The court determined that this should have indicated to Officer Armstrong that both Seaman and her car were okay. However, Officer Armstrong testified that he did not see Seaman put on her seat belt and that he was not sure if he noticed at that time that Seaman had turned on her turn signal or if he only noticed that the turn signal was on when he viewed the videotape sometime later in preparation for writing his report. Furthermore, while the fact that Seaman

11

was getting ready to drive off may have assured Officer Armstrong that Seaman's car was in working order, it would not necessarily assure him that Seaman was not experiencing disorientation or other medical or physical problems. Until he was standing next to her car, Seaman did not even acknowledge Officer Armstrong's presence or the fact that his patrol car was parked behind her with its lights flashing. This lack of reaction may also have been indicative of disorientation or other medical or physical problems.

¶27 The third prong of the *Lovegren* test provides that once "*the officer is assured* that the citizen is not in peril or is no longer in need of assistance . . . then any actions beyond that constitute a seizure . . . ." *Lovegren*, ¶ 25 (emphasis added). Hence, the resolution of the suppression issue turns on the point at which Officer Armstrong had sufficient assurances concerning Seaman's need for assistance. We also indicated in *Lovegren* that it would be a dereliction of an officer's duty to walk away from an uncertain situation in which a motorist may be in need of help. *Lovegren*, ¶ 26. Thus, the duty to investigate resides with the officer and until the officer is assured that the citizen is not in peril, the stop does not amount to a seizure.

¶28 In the instant case, Officer Armstrong testified that his uncertainty about Seaman's welfare was not resolved by his observations of Seaman as she walked around her car and got back inside. Consequently, it would have been a dereliction of Officer Armstrong's duties if, after he saw Seaman reenter her car, he drove off without speaking to her.

¶29 Moreover, this Court has acknowledged that for law enforcement officers to effectively discharge their duties, they must be given some latitude to react to and follow up

12

on their observations.  *See State v. Nelson*, 2004 MT 310, ¶ 23, 323 Mont. 510, ¶ 23, 101 P.3d 261, ¶ 23 (citing *State v. Sharp* (1985), 217 Mont. 40, 47, 702 P.2d 959, 963).  By attempting to draw a timeline between Seaman's activation of her turn signal and Officer Armstrong's approach to her car window a few seconds later, the District Court failed to accord Officer Armstrong any latitude to follow up on his observations and to assure himself that the situation did not require his assistance.  The District Court second-guessed Officer Armstrong's assessment of the situation and incorrectly concluded that Seaman's actions demonstrated conclusively that she did not need or want assistance and that Officer Armstrong was not justified in checking on her welfare.

¶30     Officer Armstrong's initial questions reflected his concern for Seaman's well-being, and there was no significant seizure or intrusion at that point.  However, while Officer Armstrong was asking Seaman if she was okay and her car was okay, he noticed the odor of alcohol.  At that point, the welfare check lawfully ripened into an investigatory DUI stop based on Officer Armstrong's subsequent observations.  We held in *Lovegren* that such an escalation of events leading to an arrest is proper under our decisions in *Hulse v. State, Dept. of Justice,* 1998 MT 108, ¶ 13, 289 Mont. 1, ¶ 13, 961 P.2d 75, ¶ 13, and *Grinde v. State* (1991), 249 Mont. 77, 81, 813 P.2d 473, 476, *overruled on other grounds by Bush v. Montana Dept. of Justice,* 1998 MT 270, 291 Mont. 359, 968 P.2d 716.  *Lovegren*, ¶ 27.

¶31     Accordingly, we hold that the District Court misinterpreted or misapplied the Community Caretaker Doctrine in this case and thereby erroneously reversed the Justice Court's Order denying Seaman's motion to suppress.

13

¶32 We reverse and remand to the District Court for entry of an order reinstating Seaman's DUI conviction.

/S/ JAMES C. NELSON

We Concur:

/S/ KARLA M. GRAY
/S/ W. WILLIAM LEAPHART
/S/ PATRICIA O. COTTER
/S/ JOHN WARNER
/S/ BRIAN MORRIS
/S/ JIM RICE