No. 00-712

IN THE SUPREME COURT OF THE STATE OF MONTANA

2002 MT 153

STATE OF MONTANA,

     Plaintiff and Respondent,

  v.

MICHAEL D. LOVEGREN,

     Defendant and Appellant.

APPEAL FROM:    District Court of the Seventh Judicial District,
In and for the County of Richland,
The Honorable Richard G. Phillips, Judge presiding.

COUNSEL OF RECORD:

     For Appellant:

          Michael D. Lovegren, Crane, Montana (*pro se*)

     For Respondent:

          Mike McGrath, Attorney General, Carol E. Schmidt, Assistant Attorney General, Helena, Montana; Mike Weber, Richland County Attorney, Daniel B. Bidegaray, Deputy Richland County Attorney, Sidney, Montana

Submitted on Briefs: July 12, 2001

Decided:  July 9, 2002

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1    Michael D. Lovegren pleaded guilty in the District Court for the Seventh Judicial District, Richland County, to the offense of driving or being in actual physical control of a vehicle while under the influence of alcohol.  Prior to entering his guilty plea, Lovegren moved to suppress all of the evidence obtained by the arresting officer, but the District Court denied his motion.  Lovegren now appeals the court's denial of his motion to suppress.  We affirm.

¶2    We address the following issue on appeal:  Did the District Court err when it denied Lovegren's motion to suppress?

### Factual and Procedural Background

¶3    On the night of October 31, 1998, Officer Gary Hofer of the Richland County Sheriff's Department was on routine patrol.  At approximately 3:05 a.m., he came upon a vehicle parked on the side of Highway 16 South in Richland County between Crane and Sidney.  The vehicle's motor was running, but its headlights were off.  Officer Hofer stopped to investigate.

¶4    When Officer Hofer approached the vehicle and looked in the window, he saw Lovegren sitting in the driver's seat.  Lovegren appeared to be asleep.  Officer Hofer knocked on the window and, when Lovegren did not respond, Officer Hofer opened the door.  Lovegren suddenly woke up and stated:  "I was drinking."  Officer Hofer smelled a strong odor of alcohol and he noticed that Lovegren's eyes were bloodshot, so he had Lovegren

perform various field sobriety tests. Lovegren failed both the one-legged stand and the heel-to-toe test. Hence, Officer Hofer transported Lovegren to the station where a breath test was performed. The test results showed that Lovegren's blood alcohol content was .115. Officer Hofer read Lovegren his Miranda rights and wrote out a citation charging him with driving under the influence of alcohol in violation of § 61-8-401, MCA.

¶5 Lovegren subsequently moved to suppress all of the evidence obtained by Officer Hofer claiming that it was an illegal search and seizure. The Justice Court denied Lovegren's motion to suppress and, on January 11, 1999, that court convicted him of violating § 61-8-401, MCA. The court fined Lovegren $420 and sentenced him to 60 days in jail with all but one day suspended. The court also suspended Lovegren's driver's license for six months. Thereafter, Lovegren appealed to the District Court.

¶6 On May 12, 1999, Lovegren filed a motion in the District Court asking the court to suppress all of the evidence obtained in the investigative stop on the grounds that Officer Hofer lacked a particularized suspicion of any wrongdoing on Lovegren's part, thus the stop was not justified. On May 26, 1999, the District Court denied Lovegren's motion stating that a particularized suspicion was not required in this situation, as Officer Hofer had a duty to investigate for Lovegren's own safety.

¶7 Lovegren entered into a plea agreement on July 13, 1999, wherein he agreed to plead guilty to the charge of driving or being in actual physical control of a vehicle while under the influence of alcohol. However, pursuant to § 46-12-204, MCA, Lovegren reserved his right to appeal the denial of his motion to suppress. Lovegren was subsequently convicted of the

3

charge and the District Court reimposed the sentence handed down by the Justice Court. Lovegren appeals.

## Discussion

¶8    *Did the District Court err when it denied Lovegren's motion to suppress?*

¶9    We review a district court's denial of a motion to suppress to determine whether the court's finding that the officer involved had a particularized suspicion to justify the investigatory stop is clearly erroneous. *State v. Farabee*, 2000 MT 265, ¶ 11, 302 Mont. 29, ¶ 11, 22 P.3d 175, ¶ 11 (citing *State v. Gilder*, 1999 MT 207, ¶ 7, 295 Mont. 483, ¶ 7, 985 P.2d 147, ¶ 7).   We review a district court's conclusions of law regarding a motion to suppress to determine whether the district court's interpretation of the law was correct. *Farabee*, ¶ 11.

¶10    Lovegren argues that his Fourth Amendment right to be free from an unreasonable search and seizure was violated when Officer Hofer, after noticing Lovegren's car parked on the side of the road, stopped to check on Lovegren's welfare.  Lovegren contends that this investigative stop was not justified because Officer Hofer did not have a particularized suspicion that Lovegren had committed, was committing, or was about to commit an offense.

¶11    Lovegren also contends that the District Court overstepped its authority by inferring more from the police reports than what they actually said.  Lovegren notes that in the police report, Officer Hofer clearly stated that the driver of the vehicle "appeared to be asleep" and that there were no references in the report to any signs of struggle or trauma to indicate the need of further assistance.  Thus, Lovegren argues that the District Court erred in concluding

4

that although the report indicates that the driver appeared to be asleep, the officer could not know whether the driver was asleep, ill, unconscious or even dead.

¶12 The State argues, on the other hand, that the District Court correctly determined that Officer Hofer did not need a particularized suspicion of criminal activity in this situation. The State maintains that the court correctly applied the "community caretaker doctrine"-- even though the court did not identify it as such--in determining that Officer Hofer was justified in stopping to check on Lovegren's welfare and that Officer Hofer would have been derelict in his duties had he not done so. Moreover, the State argues that simply because it was Lovegren's subsequent actions that created a particularized suspicion of criminal activity, that does not negate the validity of Officer Hofer's initial stop to see if Lovegren needed assistance.

¶13 Not all contact between police officers and citizens involves the "seizure" of a person under the Fourth Amendment. As the State noted in its brief on appeal, many courts recognize the existence of three categories of police-citizen encounters. *See United States v. Berry* (5th Cir. 1982), 670 F.2d 583, 591; *Thompson v. State* (Ark. 1990), 797 S.W.2d 450, 451; *People v. Murray* (Ill. 1990), 560 N.E.2d 309, 311-12; *People v. Bauman* (Ill. App. Ct. 4th Dist. 1990), 562 N.E.2d 336, 339, *cert denied* 502 U.S. 960, 112 S.Ct. 424, 116 L.Ed.2d 444 (1991); *State v. Walters* (N.M. Ct. App. 1996), 934 P.2d 282, 285; *Wilson v. State* (Wyo. 1994), 874 P.2d 215, 220.

¶14 The first category of police-citizen encounters involves the arrest of a citizen which must be supported by probable cause otherwise the Fourth Amendment prohibition against

unreasonable seizures is violated. *Henry v. United States* (1959), 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134.

¶15    The next category involves the "Terry" stop, a brief seizure of the individual that must be supported by a reasonable suspicion of criminal activity to be within acceptable Fourth Amendment boundaries. *Terry v. Ohio* (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889.

¶16    The final and least intrusive category does not involve any form of detention at all and, therefore, does not involve a seizure. This category is generally referred to as the "community caretaker" or public safety function. The United States Supreme Court recognized this category of police intrusion in *Terry* when it noted:

> Street encounters between citizens and police officers are incredibly rich in diversity. They range from wholly friendly exchanges of pleasantries or mutually useful information to hostile confrontations of armed men involving arrests, or injuries or loss of life. Moreover, hostile confrontations are not all of a piece. Some of them begin in a friendly enough manner, only to take a different turn upon the injection of some unexpected element into the conversation. Encounters are initiated by the police for a wide variety of purposes, some of which are wholly unrelated to a desire to prosecute for crime.

*Terry*, 392 U.S. at 13, 88 S.Ct. at 1875-76.

¶17    Five years after *Terry*, the Supreme Court more specifically defined the community caretaker doctrine.

6

Because of the extensive regulation of motor vehicles and traffic, and also because of the frequency with which a vehicle can become disabled or involved in an accident on public highways, the extent of police-citizen contact involving automobiles will be substantially greater than police-citizen contact in a home or office. Some such contacts will occur because the officer may believe the operator has violated a criminal statute, but many more will not be of that nature. Local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.

*Cady v. Dombrowski* (1973), 413 U.S. 433, 441, 93 S.Ct. 2523, 2528, 37 L.Ed.2d 706.

¶18 Because this Court has not squarely addressed the community caretaker doctrine,[1] we take this opportunity to survey the law from other jurisdictions in this area and to set forth our own test for application of this doctrine.

¶19 Of the many jurisdictions that have addressed this doctrine, a majority have adopted it in some form. However, the boundaries of this doctrine that control the judgment exercised by the officers in these situations are not consistent across all of the jurisdictions. Indeed, our review of the cases leads us to conclude that some jurisdictions have expanded the doctrine

---

[1] *See State v. Boyer*, 2002 MT 33, ¶ 11, 308 Mont. 276, ¶ 11, 42 P.3d 771, ¶ 11; *Grinde v. State* (1991), 249 Mont. 77, 81, 813 P.2d 473, 476, *overruled on other grounds by Bush v. Montana DOJ, Motor Vehicle Div.*, 1998 MT 270, 291 Mont. 359, 968 P.2d 716; *Patterson v. State*, 2002 MT 97, ¶ 30, 309 Mont. 381, ¶ 30, 46 P.3d 642, ¶ 30 (Nelson, J., dissenting). In these cases we referenced the police activity in the context of a "welfare check."

beyond what would likely be acceptable given the enhanced protection of the right of individual privacy and against unreasonable searches and seizures guaranteed under Article II, Sections 10 and 11 of the Montana Constitution. That we have included a broad spectrum of cases in our discussion hereafter to show the parameters of the community caretaker doctrine does not necessarily mean that we agree with all of these decisions. Our own jurisprudence will develop on a case-by-case analysis using the test we articulate later in this Opinion.

¶20     With that caveat, we note that the majority of the jurisdictions that have adopted the community caretaker doctrine have determined that a peace officer has a duty to investigate situations in which a citizen may be in peril or need some type of assistance from an officer. *See, e.g., Kozak v. Comm'r of Pub. Safety* (Minn. Ct. App. 1984), 359 N.W.2d 625, 628 ("In the proper performance of his duties, an officer has not only the right but a duty to make a reasonable investigation of vehicles parked along roadways to offer such assistance as might be needed and to inquire into the physical condition of persons in vehicles."). *See also Crauthers v. State* (Alaska Ct. App. 1986), 727 P.2d 9, 10-11 (requests for assistance from the public fall within a law enforcement officers "community caretaker function"); *State v. Martinez* (N.J. Super. Ct. 1992), 615 A.2d 279, 281 (investigating "abnormal" driving behavior in the middle of the night involves "the 'community caretaking function' expected of alert police officers"); *State v. Marcello* (Vt. 1991), 599 A.2d 357, 358 ("In some circumstances . . . police officers without reasonable suspicion of criminal activity are allowed to intrude on a person's privacy to carry out 'community caretaking' functions to

enhance public safety."); *State v. Chisholm* (Wash. Ct. App. 1985), 696 P.2d 41, 43 n.3 ("Many communities look to their officers to assist citizens or render aid under a variety of circumstances. For example, officers often deliver emergency messages, give directions, search for lost children, assist stranded motorists and render first aid."). *See also* 3 Wayne R. LaFave, *Search and Seizure* § 7.4(f) (2d ed. 1987) (officers may enter a vehicle without a warrant or reasonable suspicion if there is reason to believe the occupant is in distress and needs assistance).

¶21     Hence, the caretaking duties that come under this doctrine are varied and range from assisting a driver slumped over in his car to stopping a man walking alongside a road. *See Marsh v. State* (Alaska Ct. App. 1992), 838 P.2d 819 (checking on a car that appeared to be stalled is a caretaking function); *Thompson v. State* (Ark. 1990), 797 S.W.2d 450 (investigating a car parked for ten minutes with the lights on and the motor running is permissible under the caretaker doctrine); *People v. Murray* (Ill. 1990), 560 N.E.2d 309 (checking on a driver asleep behind the steering wheel is a permissible caretaking function); *Borowicz v. North Dakota Dept. of Transp.* (N.D. 1995), 529 N.W.2d 186 (checking on a car stopped on the side of the road where the driver is slumped over the steering wheel is permitted under the caretaker doctrine); *Commonwealth v. Waters* (Va. Ct. App. 1995), 456 S.E.2d 527 (the stop of a swaying unsteady pedestrian is a permissible caretaking function); *Wilson v. State* (Wyo. 1994), 874 P.2d 215 (the initial stop of a limping man held to be valid under the caretaker doctrine); *Duck v. State* (Ala. Crim. App. 1987), 518 So.2d 857 (a police officer's response to citizen complaints is a "routine community caretaking function"); *Bies v.*

9

*State* (Wis. 1977), 251 N.W.2d 461 (investigating a noise complaint is a caretaking activity that permitted the search of a garage).

¶22    In addition, many jurisdictions have recognized that the scope of any intrusion following the stop must be limited to those actions necessary to carry out the purposes of the stop, unless particularized suspicion or probable cause subsequently arises. *See State v. Dube* (Me. 1995), 655 A.2d 338 (initial entry into apartment by police as they accompanied building custodian so he could make emergency repairs was lawful, but squalid conditions of apartment did not create exigent circumstances justifying officers' continued presence in apartment after repairs were completed); *Apodaca v. Taxation & Revenue Dept., Motor Vehicle Div.* (N.M. Ct. App. 1994), 884 P.2d 515 (police officer's observation of defendant's motorcycle weaving within its lane of traffic supported officer's stop of defendant based on officer's concern for defendant's safety, but the scope of any intrusion following the stop must be limited to those actions necessary to carry out the purposes of the stop unless reasonable suspicion or probable cause arises); *State v. Dull* (Wis. Ct. App. 1997), 565 N.W.2d 575 (although deputy was initially acting as community caretaker when investigating noise complaint, that status ended when he determined that juvenile outside residence was intoxicated and he took juvenile into custody, thus deputy's subsequent entry into house was not justified).

¶23    Furthermore, the jurisdictions differ when determining under what standard an officer's actions will be tested to determine whether the officer properly acted under the community caretaking doctrine or whether it was a pretext for an illegal search and seizure.

10

For example, in a Kansas case, an officer on routine patrol stopped a vehicle because the officer was concerned that the driver was falling asleep at the wheel based on the vehicle's erratic driving pattern. *State v. Vistuba* (Kan. 1992), 840 P.2d 511, *overruled on other grounds by State v. Field*, 847 P.2d 1280 (Kan. 1993). The deputy in that case testified that she had no reason to believe that the driver was committing, had committed, or was about to commit a crime. However, the Supreme Court of Kansas upheld the stop and stated:

> "Nothing in the Fourth Amendment requires that the 'specific and articulable facts' relate to suspected criminal activity. . . . If we were to insist upon suspicion of activity amounting to a criminal or civil infraction to meet the [*Terry*] standard, we would be overlooking the police officer's legitimate role as a public servant to assist those in distress and to maintain and foster public safety."

*Vistuba*, 840 P.2d at 514 (quoting *State v. Pinkham* (Me. 1989), 565 A.2d 318, 319). *See also Wilson v. State* (Wyo. 1994), 874 P.2d 215 (holding that the subjective intent of the officer is irrelevant unless it is conveyed to the person being detained); *State v. Marcello* (Vt. 1991), 599 A.2d 357, 358 ("safety reasons alone can be sufficient to justify a stop, but they must be based upon specific and articulable facts").

¶24 Thus, when an officer claims that he or she acted under the community caretaker doctrine, many jurisdictions use a two-step approach to analyze the officer's actions. First, if an officer states that he stopped to assist a person who appeared to be in need of assistance, an objective view of the specific and articulable facts must be examined to determine whether they support the officer's statements. And, second, a determination must be made regarding at what moment the officer "seized" the person and thereby implicated Fourth

11

Amendment protections. Regarding the moment of "seizure," the United States Supreme Court stated in *Terry*:

> Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a "seizure" has occurred.

*Terry*, 392 U.S. at 19 n.16, 88 S.Ct. at 1879 n.16.

¶25 With this survey of the foregoing case law in mind, we adopt the following test in relation to the community caretaker doctrine. First, as long as there are objective, specific and articulable facts from which an experienced officer would suspect that a citizen is in need of help or is in peril, then that officer has the right to stop and investigate. Second, if the citizen is in need of aid, then the officer may take appropriate action to render assistance or mitigate the peril. Third, once, however, the officer is assured that the citizen is not in peril or is no longer in need of assistance or that the peril has been mitigated, then any actions beyond that constitute a seizure implicating not only the protections provided by the Fourth Amendment, but more importantly, those greater guarantees afforded under Article II, Sections 10 and 11 of the Montana Constitution as interpreted in this Court's decisions.

¶26 Applying this test in the present case, the facts support the conclusion that Officer Hofer had objective, specific and articulable facts suggesting that Lovegren might be in need of assistance. While Lovegren might simply have been asleep, he might just as likely have been ill and unconscious and in need of help. Under these circumstances, Officer Hofer had the right to check on Lovegren's welfare and to open the door of Lovegren's vehicle when Lovegren failed to respond to a knock on the window of his vehicle. As the State points out,

12

it would have been a dereliction of Officer Hofer's duties if, after knocking on the window and obtaining no response, Officer Hofer walked away and continued on his patrol. Thus, under the community caretaker doctrine, when Officer Hofer opened the door to check on Lovegren, Officer Hofer had not yet "seized" Lovegren.

¶27 However, when Officer Hofer opened the door, not only did Lovegren awake, but he voluntarily stated that he had been drinking. At that time, Officer Hofer also noticed other signs of intoxication giving him a particularized suspicion to make a further investigatory stop--i.e., the field sobriety tests--which eventually developed into probable cause for an arrest. This escalation of events leading to Lovegren's arrest is proper under our decisions in *Hulse v. DOJ, Motor Vehicle Div.*, 1998 MT 108, 289 Mont. 1, 961 P.2d 75, and *Grinde v. State* (1991), 249 Mont. 77, 81, 813 P.2d 473, 476, *overruled on other grounds by Bush v. Montana DOJ, Motor Vehicle Div.,* 1998 MT 270, 291 Mont. 359, 968 P.2d 716.

¶28 Accordingly, we hold that the District Court did not err when it denied Lovegren's motion to suppress.

¶29 Affirmed.

/S/ JAMES C. NELSON

We Concur:

/S/ W. WILLIAM LEAPHART
/S/ PATRICIA COTTER
/S/ TERRY N. TRIEWEILER
/S/ JIM RICE

13