JUSTICE WARNER
Dissents.
¶19 I agree with the Court’s opinion Defendant Smith cannot claim she legitimately expected privacy from the police in the common areas of Tash’s apartment. I also agree Smith had a reasonable expectation of privacy in Tash’s bathroom. However, the facts presented by this case meet the three-pronged test for application of the community caretaker doctrine articulated in State v. Lovegren, 2002 MT 153, ¶ 25, 310 Mont. 358, ¶ 25, 51 P.3d 471, ¶ 25, and State v. Nelson, 2004 MT 13, ¶ 7, 319 Mont. 250, ¶ 7, 84 P.3d 25, ¶ 7, and Officer Guiberson was correct in investigating the uncertain condition of the young Ms. Smith.
¶20 All of the information we have concerning this facet of the case comes from the four witnesses who testified at the suppression hearing concerning how Officer Guiberson came to open the bathroom door and find Smith with her head in the toilet. These four are Roslyn Tash, the tenant of the apartment where the party was held, Mary Redlich, with whom Ms. Smith lived, Ms. Smith the Defendant, and Officer Don Guiberson. With the possible exception of Tash’s negative response to a question of whether Smith was throwing up while the officers were there, no witness contradicted Guiberson’s version of what he was faced with and how he responded. Even then, Tash acknowledged Smith was throwing up earlier in the evening and she snuck into the *473 bathroom to check on Smith shortly before Guiberson opened the bathroom door.
¶21 Officer Guiberson testified:
Q: When you went into the apartment, what did you do next?
A: When I walked in the apartment, immediately what I did is I looked into, into the rooms, you know, to see, for officer safety purposes, to see who was in there to make sure that we weren’t going to, you know, come in contact with something. And what I did is I looked into the living room area ... and then went down into the bedi'oom area.... I could hear someone throwing up in the bathroom area.
Q: So, that was - And the bathroom’s, essentially, is at the end of the hall; is that correct?
A: At the end of the hall is a living room, to the right of that would be the bathroom. The doors are facing opposite directions.
Q: And you said you heard someone throwing up?
A: Yeah.
Q: Would you say that was - Why did that cause you to take further action? Let’s say it that way.
A: Well, if someone was sick or someone was in trouble, you know, throwing up, you could hear the heaving and whatnot, so I figured someone was probably in need of some help or something.
Q: Then what you heard was, shall we say, the extreme or perhaps serious-
MS. HOLTON: Objection, leading.
THE COURT: Please rephrase your question.
Q: ... How would you describe the character of the vomiting you heard?
A: It was pretty loud.
Q: And what did you do as a result of that?
A: Well, as a result, I asked someone - and I can’t remember who it was - who was in there. And they said it was Rebekah Smith. And as I recall, I don’t know if I knocked on the door, but I had said I was coming in at that point.
Q: And what did you see when you opened the door? Did you hear anything from inside other than vomiting?
A: No, well, it was kind of heaving vomiting. It was - Someone was extremely sick.
Q: All right. So, you said that you were coming in and then you opened the door.
A: Uh-huh.
*474 Q: And what did you see?
A: I saw Ms. Smith curled up on the floor, hugging the toilet, with her head in the toilet.
Q: Did you check her condition?
A: Yeah.
Q: What was her condition?
A: She was alive, but she was pretty - I felt was pretty intoxicated. I could smell the intoxicating substance and whatnot. Q: And what did you do with her?
A: At that point, I believe Rossy Tash walked in, was kind of, I don’t know, helping her out, so to speak. And then I left right then and went into the other room.
Examining this scenario with reference to the three factors for application of Montana’s community caretaker doctrine in Lovegren, and referenced by the Court at ¶ 14, Officer Guiberson was justified in opening the door to the bathroom and checking on Ms. Smith. If he had not done so, and had she suffered any injury from alcohol consumption, he probably would have been sued. ¶22
¶23 Considering whether the first prong of the community caretaker doctrine was present, was the officer presented with objective, specific, and articulable facts upon which to base a suspicion that a citizen is in need of help or is in peril, Guiberson was presented with the following: (a) he had just come into an apartment rented by an adult with whom he had prior professional contact where there was a loud party in progress and minors were drinking; (b) while he was checking to see that officers were not in danger, he heard loud vomiting in the bathroom; (c) he knew that whoever was in the bathroom was using its facilities for much more than, as the Court delicately phrases it, “the personal and private nature of one’s usual activities within a bathroom,” ¶ 12; (d) he knew the person in the bathroom was violently sick; (e) because there were people at the party drinking, the cause of the vomiting could well be ingesting too much alcohol; (f) because there were minors at the party who were drinking, he knew the sick person could well be a minor; (g) minors are presumed by law to not have the necessary maturity and judgment to handle their alcohol intake, and thus the sickness could be serious. These facts most certainly raise a suspicion a citizen may be in need of help, or be in peril.
¶24 The officer was more than justified in proceeding to the second, investigative, phase of the community caretaker doctrine; opening the bathroom door. When he did so he observed a fully clothed young girl not sitting on the toilet, but with her head in it, and he was justified *475 in entering to check on her condition. At that point, it became apparent she had been drinking to the point where she was sick. Fortunately, the evidence did not show she was in serious danger from her overindulgence. When it became known that Smith did not need further assistance, Guiberson retreated. He did not even embarrass Smith by arresting her on the spot, in spite of her condition.
¶25 I must confess I am a bit mystified by the Court’s decision Guiberson violated Smith’s right to privacy under these circumstances. One can only hope that some youngster is not injured as a result of the new rule that house party participants should immediately go into the bathroom and close the door when the party is busted, because the cops cannot come in, at least for awhile.
¶26 I dissent. I would affirm the judgment.