BREWER, J.,
concurring in the judgment of the court.
When, albeit politely, a uniformed police officer approaches a person on the street and requests the person’s identification, it is a fiction to suggest that most people would believe that they have a right to refuse the request or that, if they did, it would be prudent or safe to do so. When they comply with such requests, as most law abiding persons *427 likely would do, it is generally fair to characterize such compliance as acquiescent, not consensual, voluntary, or, for that matter, the product of mere conversation. My concern is that, although this case involves very different facts, the majority’s treatment of it may compel the conclusion that, as long as they do so in a civil manner, police are free, in the absence of any articulable justification, to ask anyone in a public place for their identification without effecting an unreasonable seizure of their persons or effects under Article I, section 9, of the Oregon Constitution. In my view, that would be unfortunate and, likely, unnecessary, in light of the circumstances of this case.
Article I, section 9, provides, in part:
“No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure [.]”
Unlike the protections of the Fourth Amendment to the United States Constitution, the protections afforded by Article I, section 9, including the right to exclude unlawfully obtained evidence, are not aimed at deterring police misconduct; instead, they safeguard liberty rights that inhere in the people. State v. Thompkin, 341 Or 368, 379, 143 P3d 530 (2006). As pertinent here, the government is prohibited from violating those rights by means of unreasonable seizures. A seizure of a person is a significant interference with the person’s liberty of movement. State v. Holmes, 311 Or 400, 409, 813 P2d 28 (1991).[1]
The first question here — which is where the majority begins and ends its analysis — is whether defendant was seized when the police officer requested or later held, for a brief period, his identification. This court has struggled earnestly to give meaningful content to the inquiry *428 into whether police-citizen encounters involve a significant interference with a person’s liberty of movement. This court held in Holmes:
“[L]aw enforcement officers remain free to approach persons on the street or in public places, seek their cooperation or assistance, request or impart information, or question them without being called upon to articulate a certain level of suspicion in justification if a particular encounter proves fruitful. A street or public place encounter does not amount to an Article I, section 9[,] ‘seizure’ merely because the encounter may involve inconvenience or annoyance for the citizen and the other party to the encounter is known to be a law enforcement officer. Even physical contact does not transform the encounter into a ‘seizure’ if it is a normal means of attracting a person’s attention (e.g., policeman tapping citizen on the shoulder at the outset to get a citizen’s attention). See LaFave, 3 Search and Seizure, A Treatise on the Fourth Amendment 413, § 9.2(h) (2d ed 1987). Rather, the encounter is a ‘seizure’ of a person only if the officer engages in conduct significantly beyond that accepted in ordinary social intercourse. The pivotal factor is whether the officer, even if making inquiries a private citizen would not, has otherwise conducted himself in a manner that would be perceived as a nonoffensive contact if it had occurred between two ordinary citizens.”
311 Or at 410. Cf. Wayne R. LaFave, 4 Search and Seizure § 9.4(a), 581-82 (5th ed 2012) (observing that “the confrontation is a seizure only if the officer adds to those inherent pressures by engaging in conduct significantly beyond that accepted in social intercourse [,]” which include moral and instinctive pressures to cooperate).
For some time, courts in Oregon and elsewhere wrestled with a formulation of the Holmes test that asked whether a reasonable person, in the position of the subject citizen, would feel free to terminate or leave the encounter. State v. Ashbaugh, 349 Or 297, 313, 244 P3d 360 (2010). That formulation, which was borrowed from Fourth Amendment case law, was especially problematic and ultimately unhelpful because, for among other reasons, any viable test for the existence of a seizure cannot depend solely on how a typical reasonable person would react to contact with an inquiring police officer. As one commentator has explained:
*429 “[I]f [the free to walk away language] is taken to mean that a pedestrian whose movements have been interrupted and who is questioned is likely to feel free to depart without responding, it is a highly questionable conclusion. As noted in Illinois Migrant Council v. Pilliod[, 398 F Supp 882 (ND Ill 1975)]: ‘Implicit in the introduction of the [officer] and the initial questioning is a show of authority to which the average person encountered will feel obliged to stop and respond. New will feel that they can walk away or refuse to answer.’ This, it is submitted, is an accurate characterization of the great majority of situations in which an officer approaches a pedestrian and seeks an explanation for his activities or even identification. Thus, if the ultimate issue is perceived as being whether the suspect ‘would feel free to walk away,’ then virtually all police-citizen encounters must in fact be deemed to involve a Fourth Amendment seizure. The [standard] should not be given such a literal reading as to produce such a result.”
LaFave, 4 Search and Seizure § 9.4(a) at 579-80.
In an effort to clarify the limits of police inquiries that do not amount to a seizure, this court has recently explained:
“[A] law enforcement officer constitutionally may halt and briefly detain a person passing through a public area as a means to engage the citizen long enough to impart information or seek the citizen’s cooperation or assistance. As Holmes emphasized, police are free to ‘approach persons on the street or in public places, question them, and even accompany them to another location without the encounter necessarily constituting a ‘seizure’ of a person [.]’ 311 Or at 409. As [State v. Gerrish, 311 Or 506, 815 P2d 1244 (1991),] emphasized, especially in the case of a motorist, halting and briefly detaining a citizen, even when done pursuant to an officer’s show of authority, is often a nonintrusive and socially inoffensive way to seek a citizen’s cooperation or impart information. 311 Or at 513. The important distinction in both cases was the public nature of the encounter and the practical reality that authoritatively halting the passing motorists is often the only practical means for police to have an exchange with them. No seizure occurs because the police conduct is not a socially intrusive exercise of police authority in those particular settings and circumstances.”
State v. Fair, 353 Or 588, 598, 302 P3d 417 (2013) (footnote omitted).
*430 The majority rightly points out that most people accept the need to give identifying information in public settings, including in commercial transactions and in entering public buildings. But that isn’t this case. Here, defendant was in a public place — a store. Although the proprietor had a right, indeed a duty, to ascertain his age if there was a legitimate question about his presence in age-restricted premises, if another person in the store had asked to take and examine his identification, the intrusion would palpably exceed the bounds of socially acceptable behavior. For me, it is insufficient to say that police have authority to seek information and cooperation from citizens in public places. They do, depending on the circumstances. But, because requests for cooperation can take many forms and cover a full spectrum of intrusiveness, the devil is often in the details. People don’t ask each other for identification in ordinary public encounters, no matter how politely the request is phrased. Put more bluntly, we don’t live in a society where it is acceptable for someone to approach another person in a public place and ask for — let alone take, examine, and verify— “their papers.” For that reason, it is far from clear that the police are entitled to take such actions either, unless, of course, the circumstances make them reasonable.
I would be remiss in failing to acknowledge that this court in Holmes and in later decisions, including Fair, appears to have rejected concerns similar to the ones that I have just expressed. In Ashbaugh4 for example, the court stated that, even though the officer “asked defendant a question that one private citizen ordinarily would not ask another,” there was nothing about the officer’s words that would be perceived as a show of authority that restricted her freedom of movement. 349 Or at 317. Accordingly, the court concluded that a reasonable person in the defendant’s position would not believe that the officer had significantly restricted her liberty of movement. Id. at 316. The same point has been made in different words by Professor LaFave:
“The critical factor is whether the [police officer], even if making inquiries a private citizen would not, ha[ve] otherwise conducted [themselves] in a manner which would be perceived as a nonoffensive contact if it occurred between two ordinary citizens.”
LaFave, 4 Search and Seizure § 9.4(a) at 582-83.
*431 Frankly, I am hard pressed to make sense of such statements, because they shed little light on whether a person’s liberty of movement has been significantly restricted by an investigatory request during a police encounter. Although courts and commentators have described citizen deference to such requests as voluntary or consensual, I submit that those descriptions merely indulge an unhelpful fiction. Even though the majority appears to take a critical view of such assumptions, the standard that this court has adopted for determining whether a seizure has occurred under Article I, section 9, that is, whether “a reasonable person [would] believe that a law enforcement officer intentionally and significantly restricted, interfered with, or otherwise deprived the individual of his or her liberty or freedom of movement,” 354 Or at 399, necessarily hinges on assumptions— to paraphrase the majority — about “how police and citizens do or should interact” during such encounters. 354 Or at 401 n 9. Without further elaboration, that standard is, with respect, logically unsatisfying. Its underlying premise that police can ask for cooperation that a private citizen would not, as long as the police conduct otherwise would not be perceived as offensive if it occurred between two ordinary citizens, Ashbaugh^ 349 Or at 317, simply meets itself going and coming. There should be a more principled and pragmatic way to resolve these issues, and I think that there is.
That approach should entail narrowing to a more straightforward and realistic scope what we mean by “mere conversation” between citizens and police officers and then assessing the constitutionality of seizures that exceed that threshold under the reasonableness standard that the text of Article I, section 9, imposes. Under such an approach, police are authorized to use ordinary means of communication to divert or restrict others in their activities or paths of travel in public places to the same extent that anyone else would, even if it involves a request for help in doing their jobs. But a request for identification transcends that type of ordinary interaction. Where, as here, a police officer makes such a request in an investigatory capacity, a citizen likely will believe that he or she cannot safely or prudently refuse and, thus, merely yield to an intrusion that otherwise would not be acceptable in ordinary social intercourse. And, *432 frankly, that is what should be expected so as to encourage peaceable encounters between citizens and the police.
It follows that police conduct that would suggest to a reasonable person that the person is the focus of a police investigation, and that the person is obligated to cooperate until the investigation is completed, should be understood for what it is: a constitutionally significant interference with the person’s freedom of movement. See, e.g., State v. Hall, 339 Or 7, 19, 115 P3d 908 (2005) (police seized the defendant when they took his identification for warrant check, because reasonable person would believe that his or her freedom of movement had been restricted when person is subject of pending warrant check); Thompkin, 341 Or at 378 (same). In my view, that is what happened here. The officer approached defendant and his companion in an adult bookstore with a posted 18-year minimum age and asked their ages. Apparently not satisfied with defendant’s answer, the officer then asked to examine their identifications. After doing so, the officer called dispatch to verify the validity of the licenses. In combination, those actions would communicate to a reasonable person in defendant’s position that he or she was the subject of a police investigation and must cooperate until the investigation was completed. Accordingly, I would conclude that the officer seized defendant by requesting, taking, and running through dispatch defendant’s identification.
The question remains whether the seizure was “unreasonable” for purposes of Article I, section 9. “Unreasonable” means “not governed by or acting according to reason * * * exceeding the bounds of reason.” Webster’s Third New Int’l Dictionary 2507 (unabridged ed 2002). “Reason,” in turn, is defined as “[a] statement offered as *** a justification of an act,” “a rational ground or motive,” or “a sufficient ground of explanation or of logical defense.” Id. at 1891. Thus, a particular action such as the seizure of a person is “unreasonable” when there is no rational justification for it. I am aware of no relevant context or historical evolution in the meaning of the word “unreasonable” or its roots that suggests that the framers of the Oregon Constitution would have *433 understood its meaning differently in adopting Article I, section 9.[2] By prohibiting “unreasonable” seizures, Article I, section 9, embodies a standard that is naturally adaptable to the temporal milieu in which it must be applied. The challenge today, as always, is the pliability of the term as it applies to particular circumstances and the discernment of like patterns of circumstances.
At first blush, it might seem odd — indeed, unnecessary — to reach that issue in this case. After all, if, having unmasked the fiction that the interaction in this case involved mere conversation, the court were to conclude that a seizure occurred, then there is little room for the state to maneuver under the three-category model of police-citizen encounters that the court recognized in Holmes. As the court recently reiterated:
“Analytically, police-citizen encounters typically fall into one of three categories that correlate the degree of intrusiveness on a citizen’s liberty with the degree of justification required for the intrusion * * * At one end of the continuum are mere encounters for which no justification is required. At the other end are arrests, which involve protracted custodial restraint and require probable cause. In between are temporary detentions for investigatory purposes, often termed ‘stops, which generally require reasonable suspicion. Both stops and arrests are seizures for constitutional purposes, while less restrictive encounters are not.”
Fair, 353 Or at 593 (citing Holmes, 311 Or at 408-09) (internal citations omitted). Because the state does not assert that the officer had reasonable suspicion — let alone probable cause — to believe that defendant was engaging in criminal conduct, the circumstances here do not fit into any of *434 the three “typical” categories of permissible encounters. However, the court in Holmes elaborated that “[t]he three categories are guidelines only. They are neither exhaustive nor conclusive as to what police action is a ‘seizure’ of a person.” 311 Or at 407-08. The circumstances of this case invite consideration of the issue whether another kind of seizure occurred that was reasonable.
Defendant and his companion were in an adult bookstore when the officer encountered them. The owner, operator, or manager of such an establishment has a statutory duty under the criminal code not to knowingly or recklessly permit an unaccompanied minor to enter and remain on such premises. ORS 167.080. The officer testified that he suspected, based on their appearances, that defendant and his companion were both under the age of 18. As explained below, under those circumstances, the request for identification was reasonable, not because the officer believed that defendant had committed a crime, but because the officer had a duty to protect minors from an unlawful display of obscene materials.
I acknowledge that there is no generic “community caretaking function.” Whether law enforcement officers have specific functions is a matter of statutory law. ORS 133.033 provides:
“(1) Except as otherwise expressly prohibited by law, any peace officer of this state is authorized to perform community caretaking functions.
“(2) As used in this section, ‘community caretaking functions’ means any lawful acts that are inherent in the duty of the peace officer to serve and protect the public. ‘Community caretaking function’ includes, but is not limited to:
“(a) The right to enter or remain upon the premises of another if it reasonably appears to be necessary to:
“(A) Prevent serious harm to any person or property;
“(B) Render aid to injured or ill persons; or
*435 “(C) Locate missing persons.
“(b) The right to stop or redirect traffic or aid motorists or other persons when such action reasonably appears to be necessary to:
“(A) Prevent serious harm to any person or property;
“(B) Render aid to injured or ill persons; or
“(C) Locate missing persons.
“(3) Nothing contained in this section shall be construed to limit the authority of a peace officer that is inherent in the office or that is granted by any other provision of law.”
In this case, protecting a minor from being the victim of a crime is properly inherent in the duty of a peace officer to serve and protect the public. Therefore, the officer in this case was authorized by statute to ascertain the age of defendant and his companion if the officer reasonably believed that they were underage. However, the mere exercise of an activity under ORS 133.033 does not ensure compliance with Article I, section 9. In particular, a warrantless seizure must be justified by an exception to the warrant requirement. Holmes, 311 Or at 407. The community caretaking statute is not an exception to the warrant requirement; it is the statutory expression of the well-settled precept that the actions of law enforcement officers, like all other government actors’ actions, must be traceable to some grant of authority from a politically accountable body. See State v. Bridewell, 306 Or 231, 239-40 n 6, 759 P2d 1054 (1988). ORS 133.033 is such a grant of authority. Compliance with the statute is a necessary but not sufficient element of lawful police activity of the sort that the statute specifies. As the statute itself expressly states, the action must also be one that is not “otherwise expressly prohibited by law”; it must be a “lawful act[].” ORS 133.033(1) and (2). “Whatever the meaning of lawful acts’ in the context of ORS 133.033, that meaning must be consonant with the state and federal constitutions.” State v. Dahl, 323 Or 199, 205, 915 P2d 979 (1996). Thus, a “community caretaking” search or seizure (as distinct from a search or seizure for purposes of law enforcement) must fall within the ambit of ORS 133.033, and it must also meet *436 constitutional standards. The statute provides the predicate grant of authority, and the constitution specifies limitations on that grant.
This court has not had an occasion to fully explore the relationship between the range of community caretak-ing functions that ORS 133.033 authorizes and any particular exception to the warrant requirement under Article I, section 9. However, in assessing the constitutional reasonableness of warrantless seizures, other courts have concluded that police requests for identification in furtherance of lawfully prescribed community caretaking functions — as opposed to the detection or investigation of evidence relating to a crime — do not violate constitutional guarantees against unreasonable searches and seizures. In State v. Vistuba, 251 Kan 821, 840 P2d 511 (1992), the Kansas Supreme Court went so far as to characterize community caretaking or public safety encounters as a fourth type of lawful encounter (in Holmes terms) between police and citizens. In my view, subject to appropriate limitations that preserve the protections guaranteed by Article I, section 9, there is much to recommend the logic of those cases.
The concept of a community caretaking or public safety function stems from a recognition that “ [1] ocal police have multiple responsibilities, only one of which is the enforcement of criminal law[.]” State v. Acrey, 148 Wash 2d 738, 64 P3d 594, 599 (2003); see also Cady v. Dombrowski, 413 US 433, 441, 93 S Ct 2523, 37 L Ed 2d 706 (1973). The modern police officer is a “j ack-of-all-emergencies” with “complex and multiple tasks to perform in addition to identifying and apprehending persons committing serious criminal offenses’; by default or design he [or she] is also expected ‘to aid individuals who are in danger of physical harm,’ ‘assist those who cannot care for themselves,’ and ‘provide other services on an emergency basis.’” LaFave, 3 Search and Seizure § 5.4(c) at 263 (citing Am Bar Ass’n, Standards for Criminal Justice §§ 1-1.1(b), 1-2.2 (2d ed 1980)); see also Acrey, 64 P3d at 599 (“[M]any citizens look to the police to assist them in a variety of circumstances, including delivering emergency messages, giving directions, searching for lost children, assisting stranded motorists, and rendering *437 first aid.”). To require reasonable suspicion of criminal activity before police can investigate and render assistance in these situations would severely hamstring their ability to protect and serve the public.
For those reasons, performance of a community caretaker function permits, in proper circumstances, police requests for, and the reasonable retention of, identification from people whom they encounter in the performance of their duties. State v. Ellenbecker, 464 NW2d 427, 428 (Wis App 1990); see also O’Donnell v. State, 409 SE2d 579, 582 (Ga App 1991) (“ [Considering [the driver] had voluntarily stopped in a public rest area, parked, and laid down in the vehicle late at night, causing [the] Trooper to have a legitimate concern primarily regarding his medical status, it was not unreasonable for the officer thereafter to initiate promptly a routine and limited inquiry to determine the driver’s identity.”); State v. Brunelle, 766 A2d 272, 274 (NH 2000) (holding that an officer’s request for the driver’s license and vehicle registration of the driver of a disabled vehicle was part of a limited community caretaking exception, and that such request was reasonable “in the event that any questions about the vehicle or [the trooper’s] contact with the owner subsequently arose”).
Of course, community caretaking authority is not an excuse for carrying out a criminal investigation of the person being assisted. Rather, such an encounter must be based upon specific, articulable facts establishing the need for intervention by an officer. See State v. Page, 140 Idaho 841, 844, 103 P3d 454 (2004) (officer stopping pedestrian to check on well-being exceeded community caretaking function by taking pedestrian’s driver’s license and running a warrants check; retention of driver’s license constituted an unreasonable seizure); People v. Gonzalez, 204 Ill 2d 220, 224, 789 NE2d 260 (2003) (officer not entitled to request identification from passenger stopped under community caretaking function where state failed to explain how request served a public safety function).[3] In addition, once *438 it is determined that a person does not require assistance, a request for identification cannot be justified under the community caretaking doctrine. State v. DeArman, 54 Wash App 621, 774 P2d 1247, 1249-50 (1989) (holding that officer acting in community caretaking capacity had no reasonable basis to request identification once he determined that driver did not require assistance). However, if contraband or other evidence of crime is discovered incident to the lawful performance of an officer’s duties under the community caretaker function, the officer need not ignore that which is discovered. LaFave, 3 Search and Seizure § 5.4(c) at 263-64 (“ [E]vidence of crime is sometimes inadvertently come by when a person is searched for some purpose not directly tied to the objective of detecting criminal activity [.] *** If a reasonable and good faith search is made of a person for such a purpose, then the better view is that evidence of crime discovered thereby is admissible in court.”).
Following an in-depth analysis of various concerns informing the community caretaking doctrine, the Supreme Court of Montana adopted the following three-part test to ensure its proper application:
“First, as long as there are objective, specific and articula-ble facts from which an experienced officer would suspect that a citizen is in need of help or is in peril, then that officer has the right to stop and investigate. Second, if the citizen is in need of aid, then the officer may take appropriate action to render assistance or mitigate the peril. Third, once, however, the officer is assured that the citizen is not in peril or is no longer in need of assistance or that the peril has been mitigated, then any actions beyond that constitute a seizure implicating * * * the protections provided by the Fourth Amendment, but more importantly, those greater guarantees afforded under [the state constitution].”
State v. Lovegren, 310 Mont 358, 51 P3d 471, 475-76 (2002); see also Williams v. State, 962 A2d 210 (Del 2008) (adopting same test under Delaware Constitution).
That test and the principles underlying it make good sense to me. They have the advantage of being practical in relation to a rational understanding of police duties *439 and being more workable in the trenches than some other efforts to define and apply additional categories of permissible police-citizen encounters. See, e.g., People v. De Bour, 40 NY2d 210, 352 NE2d 562 (1976).[4] They also are free of some of the confusing factual undergrowth that inheres in the line-drawing that is required under the broader understanding of the scope of mere conversation to which the majority subscribes and which, to be fair, this court, has historically endorsed. The sorts of split-second decisions that people— both officers and citizens — must make in often-spontaneous street encounters should not hinge so much on variations in tone of voice, demeanor, and the other indicia that the current state of the decisional law emphasizes.
So, where does that leave things in this case? The trial court found that, if anything, the officer was investigating whether defendant was the victim of a crime. The supporting evidence showed that, based on their appearances, the officer believed that defendant and his companion were underage. If defendant had been underage, and if the operator of the bookstore had recklessly or knowingly disregarded that fact, then defendant would have been the victim of a violation of ORS 167.080. As part of his community caretaking function, the officer’s request, taking, and brief examination of defendant’s identification to make that determination were reasonable under the circumstances. Because no unlawful seizure occurred, I respectfully concur in the judgment of the court.

 I am aware that this definition of seizure omits parts of the longer and more convoluted definition set out in Holmes, and as later modified in State v. Ashbaugh, 349 Or 297, 313, 244 P3d 360 (2010). In particular, I have left out any reference to the mental state animating the officer’s conduct, and I have not mentioned the possibility that a seizure could occur, regardless of whether the officer actually had significantly interfered with a person’s liberty of movement, where a reasonable person would believe that such interference had occurred. Baked, but not frosted, significant interference with a person’s freedom of movement is the essence of a seizure.

 From the unpaginated 1828 Webster’s Dictionary of American English:
“Unreasonable: 1. Not agreeable to reason. 2. Exceeding the bounds of reason; claiming or insisting on more than is fit; as an unreasonable demand. 3. Immoderate; exorbitant; as an unreasonable love of life or money. 4. Irrational.”
As pertinent here, the same source defined “reason” as:
“The cause, ground, principle or motive of any thing said or done; that which supports or justifies a determination, plan or measure ***. A faculty of the mind by which it distinguishes truth from falsehood, and good from evil, and which enables the possessor to deduce inferences from facts or from propositions.”

 Nor is the community caretaking function a basis for police stop and frisk practices that are not based on reasonable suspicion that the person accosted has committed or is about to commit a crime. Police officers serve as community caretakers only when their actions are “totally divorced” from the detection, *438 investigation, or acquisition of evidence relating to the violation of a criminal statute. Cady, 413 US at 441; Bridewell, 306 Or at 238.

 The New York court has adopted the following four-category model for permissible encounters:
“If a police officer seeks simply to request information from an individual, that request must be supported by an objective, credible reason, not necessarily indicative of criminality. The common-law right of inquiry, a wholly separate level of contact, is ‘activated by a founded suspicion that criminal activity is afoot and permits a somewhat greater intrusion.’ Where a police officer has reasonable suspicion that a particular person was involved in a felony or misdemeanor, the officer is authorized to forcibly stop and detain that person. Finally, where the officer has probable cause to believe that a person has committed a crime, an arrest is authorized.”
People v. Hollman, 79 NY2d 181, 184-85, 590 NE2d 204 (1992) (explaining De Bour model). One commentator has suggested that such an approach produces “more slide than scale.” Anthony G. Amsterdam, Perspectives on the Fourth Amendment, 58 Minn L Rev 349, 394 (1974).