FILED

03/08/2022

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 21-0126

DA 21-0126

IN THE SUPREME COURT OF THE STATE OF MONTANA

2022 MT 47N

IN RE THE REINSTATEMENT OF
THE DRIVER'S LICENSE OF
CHARLEE BLAYLOCK,

Petitioner and Appellant.

APPEAL FROM:     District Court of the Sixth Judicial District,
                 In and For the County of Park, Cause No. DV-20-135
                 Honorable Brenda R. Gilbert, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

            Jami L. Rebsom, Jami Rebsom Law Firm PLLC, Livingston, Montana

        For Appellee:

            Austin Knudsen, Montana Attorney General, Bree Gee, Assistant Attorney
            General, Helena, Montana

            Kendra Lassiter, Park County Attorney, Livingston, Montana

            Courtney Lawellin, Livingston City Attorney, Livingston, Montana

                                Submitted on Briefs:  February 2, 2022

                                        Decided:  March 8, 2022

Filed:

                 _____
                                Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1       Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2       Appellant Charlee Blaylock (Blaylock) appeals the denial of her petition to reinstate her driver's license entered March 5, 2021, in the Montana Sixth Judicial Court, Park County. We restate the issue on appeal as whether the arresting officer had reasonable grounds to believe Blaylock was driving under the influence upon completion of his community caretaker investigation. We conclude that the arresting officer had reasonable grounds and affirm the District Court's denial of Blaylock's petition.

¶3       On September 13, 2020, at approximately 1:00 a.m., Officer O'Neill was on patrol in Livingston when he observed a vehicle with its taillights and headlights on, parked next to a fuel pump at a Town Pump station. The Town Pump was closed and the gas pump nozzle had not been placed into the vehicle. Officer O'Neill drove up to the vehicle and observed an occupant in the driver's seat who was not moving. He noted that the vehicle was running as there was exhaust coming from the tailpipe. Officer O'Neill did not activate his overhead emergency lights.

¶4       Officer O'Neill exited his patrol car and walked around the vehicle while talking to dispatch. He next walked up to the driver's side door and saw a female in the driver's seat. During this time, the female, later identified as Blaylock, remained unresponsive. Officer

2

O'Neill shined his flashlight into the vehicle and saw Blaylock had a debit card in her hand. This led Officer O'Neill to believe she had fallen asleep or passed out before she got out to put gas into her vehicle. Officer O'Neill then knocked on the driver's side window four separate times and shouted through the glass to Blaylock. When Blaylock did not respond, Officer O'Neill opened the driver's side door to see if she was all right. Officer O'Neill testified that when Blaylock finally awoke, she twice tried to put her seatbelt on. Blaylock responded with disordered and unusual statements, stating she lived on "I E Street" and "[No], you were asleep" when Officer O'Neill told her she had been asleep in her vehicle. Officer O'Neill could smell the odor of alcohol.

¶5 Believing that Blaylock might be under the influence, Officer O'Neill asked Blaylock to step out of the vehicle. Blaylock told Officer O'Neill she had two beers earlier. Officer O'Neill next directed Blaylock to perform several standard field sobriety tests (SFSTs). Blaylock failed the SFSTs. Officer O'Neill read Blaylock the implied consent advisory and asked for a preliminary breath test. Blaylock refused to take a breath test and her license was thereafter suspended.

¶6 On September 16, 2020, Blaylock filed a petition to reinstate her privilege to drive pursuant to § 61-8-403(4)(a)(i), MCA (2021) (Section 61-8-403 was repealed effective January 1, 2022.). The District Court held an evidentiary hearing on March 3, 2021. In its March 5, 2021 Order, the District Court determined that there was reasonable suspicion to believe Blaylock "was driving or in actual physical control of a motor vehicle[] upon ways of the state open to the public [while] under the influence of alcohol" (DUI). Further, the District Court held that because Blaylock refused the breath test requested by Officer

3

O'Neill, her driver's license should remain suspended. The District Court denied Blaylock's petition. Blaylock appeals.

¶7 Blaylock argues on appeal that Officer O'Neill did not have particularized suspicion to stop Blaylock, that he was not justified under the community caretaker doctrine to stop Blaylock, and that Blaylock was illegally searched and seized when he demanded Blaylock submit to SFSTs without her consent or a search warrant.

¶8 We review a district court's ruling on a driver's license reinstatement petition to determine whether the district court's findings of fact are clearly erroneous and whether its conclusions of law are correct. *Indreland v. DOJ, Motor Vehicle Div.*, 2019 MT 141, ¶ 7, 396 Mont. 163, 451 P.3d 51. The suspension of a driver's license is presumed correct and, accordingly, the petitioner bears the burden of proving the suspension was improper. *Indreland*, ¶ 7.

¶9 A person operating or in actual physical control of a vehicle on Montana's public roadways is considered to have consented to a preliminary alcohol breath test. Section 61-8-409(1), MCA (2021). An officer having particularized suspicion that the person was driving or operating a vehicle while under the influence may request the driver take a breath test. Section 61-8-409(1), MCA (2021). The officer's suspicion must be particular to the driver's operation of or control over a vehicle while under the influence of alcohol. *Indreland*, ¶ 9. If an officer stops a driver for a reason unrelated to concerns about DUI but, upon interacting with the driver, gained a particularized suspicion that the person was driving while under the influence, the officer may request the driver submit to a breath test pursuant to § 61-8-409, MCA (2021). *Indreland*, ¶ 9. Even though a person is considered

4

to have consented to a breath test under Montana's implied consent laws, that person has the right to refuse the test. Section 61-8-409(1), (3), MCA (2021). However, a refusal of the test constitutes sufficient cause to suspend the person's driver's license. Section 61-8-409(4), MCA (2021). If a person challenges the suspension, the court must hold a hearing at which the issues are "limited to determining whether a peace officer had a particularized suspicion that the person was driving or in actual physical control of a vehicle upon ways of this state open to the public while under the influence of alcohol" and whether the person refused to submit to the test. *Indreland*, ¶ 10 (quoting § 61-8-409(5), MCA (2021)).

¶10   Blaylock argues she was stopped without particularized suspicion and that Officer O'Neill was not authorized under the community caretaker doctrine to conduct the stop. Blaylock assumes a seizure occurred. However, "[n]ot all contact between police officers and citizens involves the 'seizure' of a person under the Fourth Amendment." *State v. Lovegren*, 2002 MT 153, ¶ 13, 310 Mont. 358, 51 P.3d 471. In *Cady v. Dombroski*, 413 U.S. 433, 441, 93 S. Ct. 2523, 2528 (1973), the Supreme Court defined the community caretaker doctrine, which we adopted in *Lovegren*:

> Because of the extensive regulation of motor vehicles and traffic, and also because of the frequency with which a vehicle can become disabled or involved in an accident on public highways, the extent of police-citizen contact involving automobiles will be substantially greater than police-citizen contact in a home or office. Some such contacts will occur because the officer may believe the operator has violated a criminal statute, but many more will not be of that nature. Local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.

Moreover, in *Lovegren*, we noted "the majority of the jurisdictions that have adopted the community caretaker doctrine have determined that a peace officer has a duty to investigate situations in which a citizen may be in peril or need some type of assistance." *Lovegren*, ¶ 20. When an officer approaches a vehicle under the community caretaker doctrine, the officer must have objective, specific, and articulable facts that the person needs assistance. "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Lovegren*, ¶ 24 (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16, 88 S. Ct. 1868, 1879 n.16).

¶11     The facts support the conclusion that Officer O'Neill had objective, specific, and articulable facts suggesting that Blaylock might need assistance. She was observed in the early morning hours at a closed gas station next to a fuel pump with her vehicle running. She was unresponsive, even after Officer O'Neill knocked repeatedly on her window and walked around her vehicle while talking to dispatch. Officer O'Neill articulated specific and objective facts which warranted opening the vehicle's door to enable Blaylock to hear him and to ensure Blaylock was all right. Blaylock's vehicle was parked in a public place. Thus, the District Court correctly concluded that Officer O'Neill presented objective, specific, and articulable facts to investigate Blaylock under the community caretaker doctrine.

¶12     Officer O'Neill made observations during his welfare inquiry which gave rise to a particularized suspicion for a further DUI investigation. The facts that Officer O'Neill observed during his welfare inquiry, combined with his additional observations—the odor of alcohol, Blaylock's disordered speech, and Blaylock's statements that she had consumed

6

alcohol—supported Officer O'Neill's particularized suspicion to conduct a DUI investigation and administer SFSTs. An SFST, like a "*Terry* stop," must be based upon particularized suspicion, not probable cause. *Hulse v. DOJ, Motor Vehicle Div.*, 1998 MT 108, ¶¶ 36-38, 289 Mont. 1, 961 P.2d 75. "[I]n certain instances, particularized suspicion for the initial stop may serve as the necessary particularized suspicion for the administration of field sobriety tests, if the basis for the initial stop was such to lead an officer to believe that the driver was intoxicated." *State v. Steinmetz*, 1998 MT 114, ¶ 13, 288 Mont. 527, 961 P.2d 95. Here, under the totality of circumstances, particularized suspicion existed based upon: (1) the unusualness of Blaylock's vehicle being parked while running at a fuel pump and not being fueled; (2) Blaylock's unresponsiveness in the driver's seat of a running vehicle, likely due to her being asleep or passed out; (3) Blaylock having a debit card in her hand and presumably passing out before getting out of her car to get gas; (4) Blaylock not hearing or responding to Officer O'Neill's repeated knocking on her driver's side window; (5) the odor of alcohol emanating from Blaylock; and (6) Blaylock's disordered and confused speech. Although Officer O'Neill began his inquiry as a welfare check, Blaylock's subsequent conduct and Officer O'Neill's subsequent observations created a particularized suspicion that Blaylock was driving under the influence.

¶13 The District Court's denial of Blaylock's petition to reinstate her driver's license is affirmed.

¶14 We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions. In the opinion of the

Court, the case presents a question controlled by settled law or by the clear application of applicable standards of review.

/S/ LAURIE McKINNON

We concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ DIRK M. SANDEFUR